**ATWOOD'S TRANSPORT LINES, INC.,**
Plaintiff,

v.

**The UNITED STATES of America**
and
**The Interstate Commerce Commission,**
Defendants.

Civ. A. No. 403–62.

United States District Court
District of Columbia.

Oct. 11, 1962.

Youngdahl, J., dissented.

---

Edward G. Villalon, Washington, D. C., for plaintiff.

Betty Jo Christian, Atty., Interstate Commerce Commission, Washington, D. C., for defendants.

S. Harrison Kahn, Washington, D. C., for defendant-intervener.

Before WRIGHT, Circuit Judge, and HOLTZOFF and YOUNGDAHL, District Judges.

HOLTZOFF, District Judge.

This is an action against the United States and the Interstate Commerce Commission, brought under 28 U.S.C. §§ 1336 and 2325, by the plaintiff Atwood's Transport Lines, Inc., a corporation engaged in bus transportation between Washington, D. C., and certain points in Maryland, to set aside an order of the Interstate Commerce Commission

which directed the plaintiff to cease and desist from conducting transportation of passengers from Alexandria and Fort Belvoir, Virginia, to various unspecified points and places in the United States. The facts are not in dispute.

The plaintiff has been operating buses under certificates of public convenience and necessity issued by the Interstate Commerce Commission between Washington, D. C. and Point Lookout, Maryland, and between Washington, D. C. and the site of the United States Atomic Energy Commission near Germantown, Maryland. The plaintiff is also authorized to run buses between Jarboesville, Maryland and Piney Point, Maryland, and to carry passengers in charter operations between Washington, D. C. and Alexandria, Arlington National Cemetery and Mount Vernon, Virginia. In addition, the plaintiff has been transporting passengers in charter operations from Alexandria and Fort Belvoir, Virginia, to various unspecified points and places in the United States. It is the last mentioned activity that is challenged in this action.

The pertinent statutory provision is found in the Interstate Commerce Act, 49 U.S.C. § 308(c), and reads as follows:

"(c) Any common carrier by motor vehicle transporting passengers under a certificate issued under this chapter may transport in interstate or foreign commerce to any place special or chartered parties under such rules and regulations as the Commission shall have prescribed."

In 1941 the Interstate Commerce Commission implemented this statutory authority by adopting a series of regulations governing service to special or chartered parties.[1] Rule III of these regulations reads as follows:

"*Origin territory.* Any common carrier of passengers by motor vehicle subject to these rules may transport special or chartered parties (1) which originate at any point or points on the regular route or routes or at any off-route point or points, authorized to be served by such carrier, or (2) which originate at any point or points *within the territory served by its regular route or routes.*" [2]

The present controversy was initiated by a complaint filed before the Interstate Commerce Commission by the Alexandria, Barcroft and Washington Transit Company, which has been permitted to intervene in this action. The complaint charged that charter operations undertaken by the plaintiff, from Fort Belvoir, Virginia, were illegal and unauthorized. The proceeding before the Commission terminated in a final decision that Fort Belvoir and Alexandria charter operations were not within plaintiff's incidental authority. An order was issued directing the plaintiff to cease and desist from these operations. The plaintiff then brought this suit to set aside the order of the Commission and this three-judge court was convened in accordance with the statutory requirement. The facts having been admitted in the pleadings, the matter is before he court as though each side had moved for judgment on the pleadings.

■ It is contended by the plaintiff that Rule III, quoted above, is invalid as lacking sufficient definiteness in that the phrase, "the territory served by its regular route or routes" is too vague. It is argued that what constitutes such territory may be a matter of opinion. At the outset there is a question whether this line of argument is not a *non sequitur.* If it should be held that the regulations adopted by the Commission to implement 49 U.S.C. § 308(c) are invalid, the result would be the same as though no regulations had been promulgated. The statute, however, authorizes transportation of special or chartered parties under such rules and regulations as the Commission shall have prescribed. If the Commission fails to prescribe valid rules and regulations, a serious doubt

1. 29 M.C.C. 25, 48.

2. Emphasis supplied.

would arise whether any such operation may be conducted. It is not necessary, however, to pursue this aspect of the matter. This Court holds that the regulation is valid.

Rules and regulations promulgated by Governmental establishments pursuant to statutory authority have the force and effect of law, and concededly are subject to the same tests as statutes. It is argued that since a knowing and wilful violation of the statute involved in this action or of any rule and regulation thereunder, is a criminal offense, 49 U.S.C. § 322, the regulation in question is subject to the same requirement of definiteness as a penal statute. While a statute must be sufficiently specific to apprize persons affected by it of its requirements and of the elements constituting any criminal offense, nevertheless, the law does not require the impossible or even the impracticable. Absolute detailed certainty with the precision of a mathematical formula, is not exacted. Some leeway may be left to the discretion of the courts and administrative agencies in interpreting and enforcing a statute or regulation, even if it has a criminal aspect. It is sufficient if members of the public are placed on notice as to what is required or prohibited, and what would be deemed a criminal violation.

In this instance the Commission explained the reasons why the words "the territory served by its regular route or routes" were not limited further. It stated:

"Any general rule defining the origin territory which will fit the exact conditions peculiar to all carriers operating under varied conditions, involving such factors as density of traffic, ability of competitors to furnish suitable equipment, and proximity of garages to particular origin points, is difficult of formulation. The carriers generally concede that they should be permitted to originate chartered parties within a territory beyond the route or routes actually served in regular service. In defining origin territory, certainly a reasonable flexibility should be permitted in order that adequate service may be available to communities located in sparsely settled areas such as exist in the western portion of the United States, as compared with available service in the more densely settled areas in the East. While a limitation of origin territory to places within a 10-mile radius of the regular routes appears reasonable in the latter instance, it would be too restrictive in the former." [3]

The Court is of the opinion that the Commission acted reasonably in not defining or restricting the words in question any more precisely or exactly than it did. Consequently the regulation is not subject to objection on the score of vagueness. This conclusion is amply supported by the authorities.

One of the leading cases on this point is Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232, in which the validity of the Sherman Antitrust Act was attacked because of an alleged lack of definiteness in failure to define the phrase, "contracts in restraint of trade". It was argued that since the court had recently construed the Act as being applicable only to such contracts in restraint of trade as prejudiced the public interest, the crime defined by the statute contained an element of degree as to which there might be differences of opinion. This contention was overruled and the constitutionality of the Act was sustained in an opinion written by Mr. Justice Holmes, in which he summarized the applicable principle as follows:

" * * * the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as

3.  29 M.C.C. 39.

here; he may incur the penalty of death."

In United States v. Alford, 274 U.S. 264, 267, 47 S.Ct. 597, 71 L.Ed. 1040, a statute punishing anyone who built a fire in or *near* any forest, or other inflammable material upon the public domain, was upheld as against an objection that the word "near" was too indefinite.

In United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508, the Supreme Court sustained the validity of an Act of Congress punishing any one of certain enumerated Governmental officials, for soliciting or receiving contributions for any political purpose from any other official. The contention that the words "political purpose" were too vague to meet the requirement of definiteness was overruled.

A State statute regulating motor vehicles was involved in Sproles v. Binford, 286 U.S. 374, 393, 52 S.Ct. 581, 587, 76 L.Ed. 1167. Objections on the ground of alleged lack of definiteness were advanced against a provision exempting vehicles from limitations as to height and as to weights of loads, when used only for transportation from point of origin to the nearest practicable common carrier receiving or loading point, or vice versa, "by the shortest practicable route". The court, in an opinion by Mr. Chief Justice Hughes, held that the words "shortest practicable route" were not too vague to be understood. He added:

"The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding."

In Robinson v. United States, 324 U.S. 282, 285–286, 65 S.Ct. 666, 89 L.Ed. 944, the Court, in an opinion by Mr. Justice Black, overruled a contention that the Federal Kidnapping statute was invalid because of alleged uncertainty as to the precise meaning and scope of the word "unharmed" and the phrase "liberated unharmed".

In United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1541–1542, 91 L.Ed. 1877, the Court sustained as against an objection that it was too indefinite, a provision of the Communications Act, which made it a criminal offense to coerce a licensee of a broadcasting station to employ any persons in excess of the number of employees needed to perform actual services. Mr. Justice Black wrote as follows on this point:

"We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense.

\*　　\*　　\*　　\*　　\*　　\*

"The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards. The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more."

In American Communications Ass'n, C. I. O. v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925, the Court upheld provisions of the Labor Management Relations Act disqualifying any labor union from presenting any petition or complaint to the National Labor Relations Board unless every officer of the organization and every officer of any national or international labor organization of which it was an affiliate or constituent unit, filed an affidavit that he was not a member of the Communist Party or affiliated with it, and was not

a member of or supported any organization that believed in or taught the overthrow of the United States Government by force or by any illegal or unconstitutional methods. Knowingly and wilfully filing a false affidavit was made a criminal offense. The objection that the statute was unconstitutionally vague was overruled by the Supreme Court in an opinion written by Mr. Chief Justice Vinson, who wrote as follows:

"The argument as to vagueness stresses the breadth of such terms as 'affiliated,' 'supports' and 'illegal or unconstitutional methods.' There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important.

"The only criminal punishment specified is the application of § 35 (A) of the Criminal Code, 18 U.S.C. § 1001, which covers only those false statements made 'knowingly and willfully.' The question in any criminal prosecution involving a non-Communist affidavit must therefore be whether the affiant acted in good faith or knowingly lied concerning his affiliations, beliefs, support of organizations, etc. And since the constitutional vice in a vague or indefinite statute is the injustice to the accused in placing him on trial for an offense, the nature of which he is given no fair warning, the fact that punishment is restricted to acts done with knowledge that they contravene the statute makes this objection untenable."

The decision in Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330–331, 96 L.Ed. 367, is of particular interest, because, like the instant case, it involved a regulation promulgated by the Interstate Commerce Commission, the validity of which was assailed on the ground of indefiniteness. The regulation required drivers of motor vehicles transporting any explosive, inflammable liquid, inflammable compressed gas, or poisonous gas, to avoid "so far as practicable, and, where feasible, by prearrangement of routes, driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings." It was argued that the words, "so far as practicable, and, where feasible" were so vague and indefinite as to make the standard of guilt conjectural. The Court overruled this contention and held that the provision established a reasonably certain standard of conduct. The validity of the regulation was sustained. The opinion of the Court, written by Mr. Justice Clark, contained the following discussion of this question:

"A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."

In Roth v. United States, 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498, in an opinion written by Mr. Justice Brennan, the Supreme Court held that the words, "obscene, lewd, lascivious, or filthy * * * or other publication of an indecent character", were sufficiently definite to constitute a proper standard.

The Court remarked in the course of its opinion that "lack of precision is not itself offensive to the requirements of due process".

In McGowan v. Maryland, 366 U.S. 420, 428, 81 S.Ct. 1101, 6 L.Ed.2d 393, the Supreme Court sustained the validity of a State Sunday closing law. It was claimed that an exemption for retail sales of merchandise essential to, or customarily sold at, or incidental to, the operation of bathing beaches, amusement parks, etc. in Anne Arundel County, was unconstitutionally vague. This contention was overruled in an opinion written by Mr. Chief Justice Warren.

The foregoing authorities inescapably lead to the conclusion that the phrase contained in the regulation involved in the instant case,—"territory served by its regular route or routes"—, is sufficiently definite and is not vulnerable to the objection that it is too vague. It is of some significance, although not in itself conclusive, that this regulation has been in existence for over twenty years and all counsel agree that its validity has never been challenged. It is quite apparent that the industry has accepted and acquiesced in the regulation and has been living under it.

There remains for consideration the question whether the application of the regulation in the case at bar was in any respect arbitrary or capricious, and whether the decision of the Commission was reasonable on the basis of the facts before it, and is supported by the evidence. The question before the Commission was whether Alexandria and Fort Belvoir, Virginia, were within the territory served by the plaintiff's regular routes. The plaintiff was authorized to serve only specified points situated in Maryland. It had no authorized route in Virginia. The plaintiff's terminal is located at 12th Street and New York Avenue, in the heart of downtown Washington. Its routes proceeded through Maryland and in a southeasterly direction to Point Lookout, and in a northerly or northwesterly direction to the Atomic Energy Commission at Germantown, Maryland. The plaintiff's regular routes did not traverse any section of Virginia. On the other hand, Alexandria and Fort Belvoir are located on the Virginia side of the Potomac River. The Commission found that Alexandria was approximately two miles from the District of Columbia boundary line, while Fort Belvoir was 14.5 to 19.5 miles from the border, depending upon what route was used. Under the circumstances the record fully justified the conclusion of the Commission that Alexandria and Fort Belvoir, Virginia, may not be considered to be within the territory served by the plaintiff's regular routes.

In United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821, the Court in sustaining an order of the Interstate Commerce Commission observed that the function of the reviewing court was restricted and limited to ascertaining whether there was warrant in the law and the facts for what the Commission had done, and that the court may not substitute its own view concerning what should be done.

In Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 693, 78 L.Ed. 1260, the Court in upholding an order of the Interstate Commerce Commission stated in an opinion written by Mr. Justice Cardozo:

"The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

Judgment for the defendants.

YOUNGDAHL, District Judge (dissenting).

There are two ways of stating the principle of law which governs the scope of our review. One way, used by the majority in so lightly brushing aside the issues raised on this appeal, is that the judicial function is exhausted when there is found to be a "rational basis" for the regulations, interpretations, and

decisions of an administrative agency.[1] The other way, which describes the judicial function more affirmatively, is that this search for a "rational basis" implies that courts have a duty to strike down such regulations, interpretations, and decisions if they are indefinite, arbitrary, or illegal.[2]

The problem arises, however, not in stating the principle but in applying it to this case, particularly because it is conceded that there is no judicial precedent involving the facts presented on this appeal. The disputed issue which those facts raise is whether the Interstate Commerce Commission's regulation concerning the place of origin for certain charter bus operations complies with the mandate of Congress and meets those standards of definiteness, reasonableness, and legality which courts are competent to impose upon administrative agencies. I would hold that the challenged regulation fails to meet those standards and that the Commission has not yet formulated a rule for the place of origin for charter service as required by Congress.

The regulation, dating from 1941, supplements the Motor Carrier Act of 1935. Interstate Commerce Act, Part II, 49 U.S.C. §§ 301–327. That statute established a comprehensive regulatory network within which interstate motor carriers—principally busses and trucks—must operate. As to busses, the statute imposes two main requirements: certificates of public convenience and necessity for specified routes or territories; and approved rates.

In order for bus companies to transport special or chartered parties,[3] as distinct from their regular route service, two procedures are available. One is for the bus company to seek a special certificate of public convenience and necessity for particular charter operations which the company expects to operate from time to time. 49 U.S.C. § 307(a). The other procedure—the one involved in the present case—is for the bus company to undertake charter service as an *incident* of its regular route service, as provided in § 308(c):

"Any common carrier by motor vehicle transporting passengers under a certificate issued under this chapter may transport in interstate or foreign commerce to any place special or chartered parties under such rules and regulations as the Commission *shall have prescribed.*" (Emphasis added).

Two observations must be made about this statute. The first is that while the statute says that incidental charter service can have points of *destination* "any place" in the world, the statute is completely silent as to permissible points of *origin.* The second observation is that the statute in using the words "shall have prescribed" *requires* the Commission to issue rules and regulations which will enable bus companies to exercise their statutory right to transport chartered parties as an incident of their regular certificated service.[4] It there-

---

1. Mississippi Valley Barge Line Co v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934).

2. Administrative Procedure Act, § 10(e), 5 U.S.C. § 1009.

3. "The term 'special or chartered party,' as used in these regulations, means a group of persons who, pursuant to a common purpose and under a single contract, and at a fixed charge for the vehicle in accordance with the carrier's tariff, lawfully on file with the Commission, have acquired the exclusive use of a passenger-carrying motor vehicle to travel together as a group to a specified destination or for a particular itinerary, either agreed upon in advance or modified by the chartered group after having left the place of origin. The term 'regular route or routes,' as used in these regulations, means the specific highway or highways over which a motor common carrier of passengers is authorized to operate between fixed termini." Regulations Governing Special or Chartered Party Service (Rule II), 29 M.C.C. 25, 47–8 (1941).

4. The Senate specifically made such rules and regulations mandatory by changing

fore became the duty of the Commission to clarify by a rule or a regulation the area of permissible points of origin.

This duty the Commission attempted to fulfill in 1941, after briefs and arguments by a number of carriers and carrier associations. The Rules and Regulations as adopted occupy a three-page appendix to an opinion explaining why the Commission adopted these rules rather than some others which had been proposed. Regulations Governing Special or Chartered Party Service, 29 M.C.C. 25, 47–9 (1941). It is Rule III as there adopted which is at issue in the present case:

> "Any common carrier of passengers by motor vehicle subject to these rules may transport special or chartered parties (1) which originate at any point or points on the regular route or routes or at any off-route point or points, authorized to be served by such carrier, or (2) which originate at *any point or points within the territory served by its regular route or routes.*" (Emphasis added).

This is the first time that this regulation has been directly challenged in the courts. I dissent from my brethren and would strike down Rule III, and the interpretations of it by the Commission, as indefinite, arbitrary, and illegal.

## I

### Indefiniteness

The majority opinion states at its outset that "there is a question" whether striking down Rule III on the ground of indefiniteness would not result in a "*non-sequitur*," because the statute authorizes incidental charter service under rules and regulations, and thus strik-

ing down this rule would raise "a serious doubt" whether *any* incidental charter operations by any carrier could be conducted. In other words, the majority in effect declares that without valid rules, there could be no valid charter operations and thus the clear mandate of Congress could be avoided. It seems to me that the *non-sequitur* is in the majority's reasoning, for that reasoning is based upon the erroneous assumption that incidental charter rights derive from the rules rather than from the statute. It is true that the statute authorizes incidental charter operations "under such rules and regulations as the Commission shall have prescribed." But that language does not mean that if the Commission were to fail to carry out the clear mandate of Congress, all incidental charter operations would be forced to cease. Such a result would run contrary to past practice under the statute, as well as to the policy which Congress intended § 308(c) to implement.

As to past practice, for six years— from 1935 to 1941—incidental charter operations were carried on by the industry without any general rules or regulations having yet been adopted, even though the Commission in deciding particular controversies about the scope of charter operations recognized that it might later promulgate such rules and regulations.[5] Thus an absence of rules does not mean the termination of charter operations.

As to the policy of Congress, the whole point behind the mandatory language *requiring* the Commission to promulgate rules and regulations was to make clear that the industry's incidental charter rights were *rights*, not subject to industry-wide termination by the Commission. Surely the majority is not sug-

the words "may prescribe" to "shall have prescribed," 79 Cong.Rec. 5664 (April 15, 1935), and in the latter form the bill became law.

5. E. g., Peninsula Transit Corp., Common Carrier Application, 1 M.C.C. 440, 442–3, (1937); Norfolk Southern Bus Corp., Common Carrier Application, 1 M.C.C.

603, 606 (1937); North Coast Transp. Co., Common Carrier Application, 2 M.C. C. 67, 69 (1937); White Horse Pike Bus Co., Inc., Common Carrier Application, 2 M.C.C. 79, 81 (1937). And see Regulations Governing Special or Chartered Party Service, supra, 29 M.C.C. at 39, n. 1.

gesting that *if* the Commission were to flaunt the clear duty which Congress imposed—to prescribe rules and regulations governing incidental charter operations —the statute would cut off the very rights which that clear duty was intended to protect. Such an interpretation would penalize the very people whom § 308(c) was designed to benefit: the bus companies and the public. It is always the duty of courts to avoid applying statutory language in a manner which negates the rational purpose of Congress.

If this Court were to strike down Rule III on the ground of indefiniteness, no incidental charter service would have to terminate. Instead, the Commission would promptly be required to formulate a new rule, and any controversies arising in the interim would be held in abeyance pending the promulgation of that new rule. Such a result is in no way a *non-sequitur;* indeed, it is the only result consistent with the judicial function of overseeing administrative agencies in general, and the Interstate Commerce Commission in particular. 28 U.S.C. §§ 1336, 2325.

On the merits, the majority opinion dismisses the defendant's argument that Rule III is so vague and uncertain as to be unlawful, by citing a list of cases in which various phrases in other statutes and regulations have been held to be sufficiently definite. General language from cases (cited in the majority opinion) involving the federal kidnapping statute, the Communications Act, the Labor Management Relations Act, obscenity statutes, Sunday closing laws, or even statutes and regulations dealing with motor vehicles, have no relevance at all to the particular language of Rule III. Such a list of "authorities" is not helpful in resolving the issue presented here, and does not "inescapably lead to the conclusion" that the disputed phrase "is not vulnerable to the objection that it is too vague." (Majority opinion, p. 173). An opposing list of "authorities" could be cited, in which other phrases have been held void for vagueness, but they likewise would be of no assistance in evaluating the particular regulation challenged in this case. The task of deciding whether disputed language is, or is not, so indefinite as to be unlawful is always to be performed by a close examination of particular words in a particular context—and never by a list of some other words in some other contexts.

The facts of the present case supply the proper context for a judicial treatment of the particular language of Rule III. These facts vividly illustrate the state of complete uncertainty in which bus companies are left when they try to comply with Rule III's vague language.

Atwood's Transport Lines, Inc., has regular route certificates to operate on a line which cuts roughly diagonally through the center of Washington, D. C., from the southeast to the northwest. In the southeasterly direction, the lines run for many miles into Maryland down to Point Lookout on Chesapeake Bay and Piney Point on the Potomac. In the northwesterly direction, the lines run for many miles into Maryland to Germantown. As part of its incidental charter operations, Atwood's since its incorporation in 1945 has transported charter parties originating at Alexandria and Fort Belvoir, both across the Potomac in Virginia. (Atwood's predecessor-in-interest conducted charter service by limousine and passenger cars from Fort Belvoir as long ago as 1916.) Alexandria is two miles, and Fort Belvoir is 14.5 miles, from the nearest boundary line of the District of Columbia, which—as noted above—is within Atwood's certificated routes.[6]

---

6. We may take judicial notice of the fact that the Woodrow Wilson Memorial Bridge connecting Maryland with Virginia at Alexandria was opened on December 28, 1961, five months after the Commission made its decision in this case, and that by using that bridge, Alexandria and Fort Belvoir would be nearer to Atwood's certificated routes in southeast Maryland than they are to the certificated route through the District of Columbia itself. Thus technology has already sub-

A competitor of Atwood's (presumably the Alexandria, Barcroft and Washington Transit Co., the defendant-intervenor in the present case) questioned Atwood's serving Fort Belvoir, and in October, 1958, Atwood's itself inquired directly from the Interstate Commerce Commission whether it was lawful to originate charter parties from Fort Belvoir, "since it is believed to be within the metropolitan area of Washington, D. C." (Letter from Atwood's to the director of the Commission's Bureau of Operating Rights, October 7, 1958.) The director of the Commission's Bureau of Operating Rights replied: "The Commission has not generally defined the extent of the 'territory served' by a carrier's regular route or routes, * * * there being many factors which may enter into the situation at a given point." (Letter, October 14, 1958.) His advice, however, was that Atwood's could lawfully originate charter operations from Fort Belvoir. Of course, this reply was an "informal opinion," not binding in any way, but the fact that even the director of the Commission's Bureau of Operating Rights could not tell how the Commission might apply its own Rule III is persuasive of Rule III's indefiniteness. Thereafter, in June, 1959, the competitor, A. B. & W., filed a formal complaint before the Commission charging that Atwood's was unlawfully originating charter parties at Fort Belvoir. After findings by an Examiner in 1960, the Commission, in July, 1961, agreed with A. B. & W. and ordered Atwood's to cease and desist from originating charter parties at Fort Belvoir and Alexandria. The execution of that order was stayed pending the outcome of Atwood's direct appeal to this Court.

In this context, the issue for this Court is to decide whether the language of Rule III is definite enough fairly to subject one bus company to an attack by another—and to the prolonged litigation which has followed therefrom—on the ground that two Virginia suburbs of Washington, D. C., the one two and the other 14.9 miles from metropolitan D. C., are not within the "territory served" by regular routes which pass through D.C. from Maryland. The issue is not to evaluate the arguments which those two bus companies advanced before the Commission, but rather to decide whether the language of Rule III, which those arguments assumed to be the controlling law, is itself valid. I would hold that language to be insufficiently definite.

It is not difficult to discover where the Commission found the language contained in Rule III. Section 308(a) of the statute provides that the scope of regular certificated operations may be defined in two ways, the first by *routes* on a map (routes, fixed termini, and intermediate and off-route points), and the second by *area* ("in case of operations not over specified routes or between fixed termini, the *territory within which,* the motor carrier is authorized to operate").[7] When it came to the task of specifying permissible points of origin for incidental charter operations, the Commission realized that those points of origin had to extend beyond the particular *routes* specified in the certificate, because charter parties often have to be picked up at points not on existing routes at all. Indeed, the essence of charter operations is individualized service—one ingredient of which is frequently door-to-door service.[8] On the other hand, there had

stantially changed the "territory served" by Atwood's "regular route or routes" —a fact which points up the complete uncertainty of Rule III.

7. "Any certificate issued under section 306 or 307 of this title shall specify the service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of

operations not over specified routes or between fixed termini, the territory within which, the motor carrier is authorized to operate * * *." 49 U.S.C. § 308(a).

8. "Carriers engaged in the transportation of special or chartered parties * * * perform a specialized service, and section 208(c) [49 U.S.C. § 308(c)] as construed by us does not require that origin territory of that service need be limited strict-

to be some limitation placed upon the extent to which bus companies could go outside of their certificated routes if incidental charter operations were to remain *incidental*. And so, in Rule III, the Commission went back to the statute itself, found those words dealing with *routes* and those words dealing with *area,* and blended them into a statement that incidental charter service could originate "at any point or points within the territory served by its regular route **or** routes."

Obviously, the reference to *territory* in the statutory specifications for certificates ("the territory within which") had a definite meaning, because individual certificates of public convenience and necessity would delineate with precision the area that could be served. But the reference to *territory* in the regulation dealing with incidental charter service, ("within the territory served") leaves *completely at large* the crucial question of how far from their certificated routes bus companies may stray to pick up charter parties.

In the language of Rule III, what "territory" is "served" by a bus company's "regular route or routes"? The words would seem to require each bus company to determine all of the places—homes, businesses, stores, restaurants, theatres, etc.—which all of its passengers come from, or go to. Yet such a determination has never been even remotely suggested by the Interstate Commerce Commission, presumably because to require it would create an unbearable economic burden upon bus companies, which might choose simply to eliminate incidental charter operations. But without such a determination, anyone trying to apply the language of Rule III is left with nothing but a restatement of the original problem: that bus companies may stray from their certificated lines for some undetermined distance into some undefined area to pick up charter parties. The scope of

ly to the points and places which regular-route carriers are specifically authorized to serve." Regulations Governing Special or Chartered Party Service, supra, 29 M.C.C. at 39.

these distances and areas is precisely the question which the statute left unclear and which the Commission was therefore required to answer by appropriate rules or regulations. In effect, the "rule" dealing with points of origin is thus no rule at all, because it is so general and indefinite as to provide no guide in concrete situations.

The issue for the Court is not, as the majority opinion suggests, to determine whether there was a rational basis for leaving Rule III in this indefinite state. (Majority opinion, pp. 170, 173.) If that were the judicial test, one might agree with the Commission that a "general rule defining the origin territory which will fit the exact conditions peculiar to all carriers operating under varied conditions * * * is difficult of formulation." Regulations Governing Special or Chartered Party Service, supra, 29 M.C.C. at 25. In this sense, there might well be a "rational basis" for leaving the question completely at large. But Congress has determined otherwise. The fact that a general rule, even a fairly detailed one, may be "difficult of formulation" does not mean that the Commission does not have to try. Indeed, the concluding quotation in the majority's opinion states the proper, more precise test: "The judicial function is exhausted when there is found to be a rational basis for *the conclusions approved* by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 693–694, 78 L.Ed. 1260 (1934) (Cardozo, J.) (emphasis added). The test is whether there is a rational basis for *the conclusions approved*—the approved Rule III; not whether there is a rational basis for coming to no conclusion at all. Of course courts may not substitute their judgment for the judgment of the Commission; but when the Commission has not exercised its judgment except to decide *not* to decide, then courts have a duty to say so.[9]

9. In the Mississippi Valley Barge Line case, it is significant that Mr. Justice Cardozo stated, in the sentence immediately following the one quoted in the majority opinion: "In this instance the care

There is no rational basis for Rule III. It simply restates the question, makes no attempt to answer it, thereby fails to comply with the mandate of Congress, and results in leaving bus companies in a state of complete uncertainty. Bus companies have a right to have this state of uncertainty corrected, for three important reasons which go beyond the particular controversy now before us.

First, the serious nature of possible sanctions for a violation of Rule III requires this Court to insist upon definiteness. Section 312(a) provides for the suspension, change, or revocation of a carrier's certificate for "willful failure to comply with any * * * lawful order, rule, or regulation * * *." Section 322(a) provides for a $500 fine (plus $200 to $500 per day for as long as the violation continues) for anyone "knowingly and willfully violating * * * any rule, regulation, requirement, or order * * *." Exactly what might constitute a "willful" violation of Rule III is not clear, but because of the flexible meanings of "willfulness" this Court should be particularly concerned about the indefiniteness of Rule III. This the majority opinion concedes when it says that a regulation must be "sufficiently specific to apprize persons affected by it of its requirements and of the elements constituting any criminal offense". (p. 170). Rule III is not thus "sufficiently specific."

Second, regulations of the Commission should be sufficiently definite to enable carriers to plan intelligently and efficiently for the requirements of their businesses. Common carriers are clothed with the interests of both the public and themselves, and both interests are best served when carriers know with reasonable certainty how large a fleet of busses may be needed. There is always an element of uncertainty in such predictions, but the uncertainty should not be compounded by the risks of an adverse Commission decision on the proper scope of the vague language of Rule III.[10] In providing for mandatory rules and regulations, the Congress contemplated that carriers could expect reasonably clear standards to use in predicting their economic needs, and these standards Rule III fails to provide.

Third, the large amount of litigation over the scope of Rule III emphasizes the harm which stems directly from the vagueness of that rule. The majority of this Court declares that it is "of some significance" that Rule III "has been in existence for over twenty years and * * * that its validity has never been challenged. It is quite apparent that the industry has accepted and acquiesced in the regulation and has been living under it." This statement is accurate only if we were to assume that a failure to bring the matter to the attention of the courts indicates acceptance and acquiescence. That such an assumption is erroneous is indicated by the number of challenges in the Commission itself. In addition to the published decisions concerning the scope of Rule III,[11] we do not know how many

and patience with which the Commission fulfilled its appointed task are plain, even to the casual reader * * *." 292 U.S. at 287, 54 S.Ct. at 694. In the present case, the "appointed task" was not fulfilled at all.

10. On precisely this general point, Judge Friendly of the Second Circuit has written that a main reason "for definite standards of administrative adjudication is the social value in encouraging the security of transactions * * *. A trucker contemplating the purchase of a new fleet should know the degree to which he will or will not be protected from rate-cutting by other truckers or by competing modes of transportation. Even a disappointing answer to such questions is better than none." Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv. L.Rev. 863, 878-9 (1962).

11. e. g., Mohawk Coach Lines, Inc. v. Hudson Transit Lines, Inc., Docket No. M.C.-C-2605, —— M.C.C. —— (served June 8, 1962); The Blue Line, Inc. v. The Short Line of Connecticut, Inc., 88 M.C.C. 201 (1961); Somerset Bus Co., Inc. v. Suburban Transit Corp., 88 M.C.C. 13 (1961); Hudson Transit Lines, Inc., Extension—Long Island, N. Y., 76 M.C.C. 215 (1958); Starr Transit Co., Inc., In-

unpublished decisions and informal opinions have had to be rendered by the Commission. At least one unpublished decision and one informal opinion have involved Atwood's itself, so the number involving *all* carriers is not small. The entire motor carrier industry deserves more than controversy and confusion over the scope of what really amounts to no rule at all. As Commissioner Webb in this very case declared in dissent:

> "The Commission's regulation is unknowable and its enforcement is necessarily random if the key phrase, 'within the territory', is not defined with a modicum of precision. * * * It is impossible for any motor bus operator to know with reasonable certainty the 'territory' beyond specifically authorized points of service from which charter parties may be originated. * * * The Commission's duty to remove uncertainty is clear. Rights conferred by the Congress should not be vitiated by vague and uncertain criteria nor should the exercise of those rights be fraught with peril." Alexandria, Barcroft and Washington Transit Co. v. Atwood's Transp. Lines, Inc., 86 M.C.C. 399, 406–7 (1961) (dissenting opinion).

With this statement I agree.

## II

### *Arbitrariness*

The majority opinion expressed satisfaction with the reasons given by the Commission for failing to specify further the meaning of Rule III, and apparently approved a case-by-case approach in which the Commission would continue to apply to particular charter controversies a list of "factors." Although I agree that in many instances a case-by-case approach is proper, it seems improper to me to "decide" these cases by a list of

"factors," rather than under a definite rule. Even assuming *arguendo* that "factors" set forth in Commission opinions may be considered as if they were a part of the regulation itself, a consideration of the "factors" listed by the Commission does not provide a reasoned basis for Commission conclusions. Such an approach leaves reviewing courts completely in the dark in trying to evaluate—as it is our duty to evaluate—the reasonableness or unreasonableness of a particular conclusion.

The Commission has been listing "factors" to be considered in deciding the scope of the phrase "within the territory served" since 1941, when such "factors" as "density of traffic, ability of competitors to furnish suitable equipment, and proximity of garages to particular origin points," were listed as relevant. 29 M.C.C. at 39. In the present case, the Commission declared that "determination of this problem depends upon many different facts, including the individual circumstances, the terrain, the density of the population, proximity of highways, the practical administration of the service, the operations of competing carriers and their ability to perform the service involved." 86 M.C.C. at 404.

Aside from the operations of competitors, which will be discussed below in Part III, I fail to understand how the other "facts" or "factors" are helpful. In what particular ways are the "proximity of highways" or "the terrain" relevant? Simply to list them does not assist either courts or carriers in evaluating the proper scope of the words. And what "the practical administration of the service" and "the individual circumstances" add to anyone's understanding is completely unclear.

Because these "factors" are unclear, it is virtually impossible to evaluate their application by the Commission in the

terpretation of Charter Authority, 74 M.C.C. 773 (1958); Lewis—Interpretation of Charter Authority, 73 M.C.C. 447 (1957); Kirschbaum, Extension Charter Operations, 52 M.C.C. 670 (1951); Public

Service Interstate Trans. Co., Common Carrier Application, 42 M.C.C. 277 (1943); Indiana Motor Bus Co., Extension of Operations—Charter Parties, 41 M.C.C. 577 (1942).

present case. The two-member majority of the Commission wrote:

> "Defendant presently performs very limited operations over only two regular routes, and those routes move in directly opposite directions from its terminal in Washington, with the one to the southeast through Maryland to Point Lookout, and the other to the northwest to Germantown. At no time do either of the routes approach any closer to Fort Belvoir than at the carrier's terminal in Washington. It is obvious then, that the military reservation under consideration is some 20 miles directly off any point on defendant's regular routes, and, in view of the direction of the carrier's routes, the traffic at Fort Belvoir *would have no relation whatever to the service performed by the carrier over its regular routes. There would appear to be no mutuality whatever* between the traffic which would be served in charter operations from Fort Belvoir and the traffic which is served every day by defendant over its regular routes. Also, it is clear that defendant is of course required to traverse territory directly away from its regular routes for some 20 miles to Fort Belvoir in order to originate the traffic here under consideration. In addition to the lack of mutuality between the traffic being served by the pertinent regular-route service and that proposed to be served in the claimed incidental charter territory, the boundaries and the occupancy of the terrain, including the distinction between Washington and its suburban appendages are especially important here in view of defendant's limited operations. Defendant's regular-route operations have no connection with Virginia, and, consequently, with Washington's suburban appendages in Virginia. * * * In reaching this conclusion, we have recognized * * * that a number of well established motor passenger carriers serve Washington, some of which operate over U. S. Highway 1 which passes directly through the military reservation at Fort Belvoir. In view of these circumstances, we are unable to conclude that Fort Belvoir may be properly considered to be a point 'within the territory' served by defendant's regular routes so as to enable the transportation of charter parties under section 208(c) [49 U.S.C. § 308(c)] of the act. All that has been said above with respect to Fort Belvoir, *with the exception of distance from defendant's terminal and the character of traffic involved at that point,* applies equally to Alexandria." 86 M.C.C. at 405–6. (Emphasis added).

I have set this passage forth at some length because it constitutes the crucial bit of "reasoning" in the Commission's opinion. Aside from the reference to competitors, which will be considered below in Part III, it seems to me that the Commission has merely restated the facts about distance, direction, the Virginia-Maryland boundary, and "the distinction between Washington and its suburban appendages." All of this merely restates the question; it does not provide an answer. The only hint of an answer occurs in the discussion of "mutuality of traffic," but since there had been no findings of fact on traffic patterns, the Commission on this point was forced to speak conjecturally: *"It is obvious then,* that * * * the traffic at Fort Belvoir *would have* no relation whatever to the service performed by the carrier over its regular routes. There *would appear to be* no mutuality whatever * * *."* Not only is this crucial bit of reasoning completely unsupported, but the Commission itself, in the last sentence in the passage quoted above, admits that it does not apply to Alexandria at all. Thus the entire passage seems no more than a collection of empty words.

In this case, the Commission reaffirmed its conclusion that "the best method of dealing with this particular problem was to consider each proceeding upon its own peculiar circumstances." 86

M.C.C. at 403. It is all well and good to consider each proceeding "upon its own peculiar circumstances." But unless the Commission in the course of such consideration is applying some reasonably clear and definite *standards*—not merely a list of "factors"—the appeal to "peculiar circumstances" is merely a facade for completely *ad hoc* and unreasoned decision-making. The Commission declared that it had "consistently recognized that no rigid standard can be established by which to determine precisely the territory from which a carrier possessing incidental charter rights could originate charter parties." 86 M.C.C. at 404-5. It seems to me that the only consistency the Commission can properly claim is to have recognized no standards at all. Another word for that kind of consistency is arbitrariness.

### III

#### *Illegality*

One of the "factors" mentioned by the Commission as relevant to determining the scope of the phrase "within the territory served" was the availability of competing bus companies which could perform the same charter service. It is contrary to the plain language of the statute for the Commission to consider competitors at all.

Section 308(c) provides for an incidental charter right which arises automatically from the bus company's certificate of convenience and necessity. The nature and quality of existing service is of course highly relevant to the inital grant of a certificate of convenience and necessity. But once granted, that certificate automatically provides for the right to originate charter parties.[12] The existence, nature, or quality of competitors' equipment or service cannot again be considered. Even the disputed Rule III itself, however unclear it is in other respects, is clear in establishing a solely geographical test in the words "within the territory served." Thus it was completely illegal for the Commission to consider at all the fact that some "well established motor passenger carriers" operate over U. S. Highway Number 1, which passes directly through the military reservation at Fort Belvoir. 86 M.C.C. at 406. The operations of these "well established" competitors are completely irrelevant.

Once again, I agree with dissenting Commissioner Webb, who declared in this case:

"One criterion employed by the majority is not authorized by the statute. Incidental charter rights are conferred by section 208(c) [49 U. S.C. § 308(c)] without proof of public convenience and necessity. That statutory purpose is defeated to the extent that consideration is given to 'the operations of competing carriers and their ability to perform the service involved.' The

---

12. "The Commission takes the position that chartering privileges are incidental to a grant of regular route authority under Section 207(a) [49 U.S.C. § 307(a)] and arise automatically under Section 208 (c) [49 U.S.C. § 308(c)] of the Interstate Commerce Act * * *. [A]s early as 1937, Section 208(c) was interpreted to be a mandatory provision granting the Commission no authority to place any limitation in a certificate which would restrict charter privileges. Peninsula Transit Corporation Common Carrier Application, 1 M.C.C. 440, 442 (1937). In the 1941 Regulations Governing Special or Chartered Party Service, 29 M.C.C. 25, 46, the Commission reaffirmed that 'Section 208(c) * * * confers an additional right, *without proof, and which*

*is not severable*, to carriers operating over a regular route or routes and between fixed termini * * *.' (Emphasis added.) The Commission also adhered to this interpretation in the Baltimore & A. R. R. Extension—Fort George G. Meade, 63 M.C.C. 357, 366 (1954), as well as in the present case. Thus, for close to a quarter century, the Commission had consistently interpreted Section 208(c) as a mandatory provision. This interpretation, the parties inform us, has been made known to the Congress. We are satisfied that the Commission's interpretation is a reasonable one within the scope of the power and discretion conferred by the governing statute." Safeway Trails, Inc. v. Interstate Commerce Commission, 176 F. Supp. 201, 204-205 (D.D.C.1959).

question of what points fall 'within the territory' served by a carrier's regular routes is an economic and geographic question and not a question involving a need for charter service." 86 M.C.C. at 407.

I cannot understand why the majority of the Commission and the majority of this court fail to discuss this issue at all. For the relevance or irrelevance of competitors goes to the heart of the statutory scheme concerning incidental charter rights. One of the fears of Congress in enacting the entire Motor Carrier Act was that by regulating the industry, competition would be stifled.[13]

One of the areas in which Congress must have intended competition to be preserved was that of efficient, speedy, and individualized charter service. For the Commission to deny incidental charter rights to Atwood's partly on the ground that other bus companies operate over U. S. Highway No. 1 seems to me to be completely at odds with the policy of Congress, with the statute, and even with the disputed language of Rule III itself.

Of course no court can force an administrative agency to achieve an impossible mathematical certainty, but it seems to me that it is possible in the case of Rule III to establish a reasonably definite rule which would consider geographical situations and differences between urban and rural communities and even then recognize a need for interpretation in certain cases. The Commission might consider, for example, a 25-mile limitation for some areas of the country, and a 100-mile limitation for others. Simply because a 10-mile limitation was rejected by the Commission as impractical over twenty years ago does not mean that some other geographical formula could not now be devised which would be reasonably definite. In any event, the pres-

ent method for dealing with the scope of permissible points of origin for incidental charter service is illegal, arbitrary, and so indefinite as to have no rational basis. I am not indicating that Atwood's is entitled to originate the particular charter operations at issue here, but I am merely stating that it is entitled to have that issue determined under a definite rule which Congress required the Interstate Commerce Commission to formulate.

I would thus return the case to the Interstate Commerce Commission with instructions to grant the timely request which Atwood's itself made before the Commission: that the Commission institute an industry-wide investigation looking toward the promulgation of a new rule which will satisfy standards of definiteness, reasonableness, and legality.

---

13. Note, for example, the following remarks of Representative Sadowski, who piloted the bill through the House: "It has been suggested that the granting of certificates of convenience and necessity may cause monopoly. There seems to be no basis for this contention. There is nothing in the bill to prohibit the Commission from granting two or more certificates over the same route, and there are many operators competing on the same routes now. * * *." 79 Cong.Record 12206 (July 31, 1935).