Scott DANKMAN, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF
ELECTIONS AND ETHICS,
Respondent,

Arrington Dixon, et al., Intervenors.

Arrington DIXON, et al., Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF
ELECTIONS AND ETHICS,
Respondent,

Scott Dankman, Intervenor.

Nos. 81–977, 81–978.

District of Columbia Court of Appeals.

Argued En Banc Oct. 13, 1981.

Decided Oct. 13, 1981.

508

H. Richard Mayberry, Jr., Washington, D. C., for petitioner in No. 81–977 and intervenor in No. 81–978.

Matthew S. Watson, Washington, D. C., with whom Barry R. Lenoir and William P. Lightfoot, Landover, Md., were on the briefs, for intervenors in No. 81–977 and petitioners in No. 81–978.

William H. Lewis, Gen. Counsel of the District of Columbia Bd. of Elections and Ethics, Washington, D. C., for respondent.

Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and David P. Sutton and Elizabeth J. Doverman, Asst. Corp. Counsel, Washington, D. C., were on the brief for the District of Columbia as amicus curiae.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS, MACK, FERREN, PRYOR, and BELSON, Associate Judges.

PER CURIAM:

On October 13, 1981, we ordered "that the order of the Board [of Elections and Ethics]

hereby is set aside and the cause is remanded to the Board with directions to certify, *nunc pro tunc* as of August 3, 1981, Initiative Seven for inclusion on the November 3, 1981, ballot." The order noted that Chief Judge NEWMAN and Associate Judges MACK and PRYOR dissented, and that "[o]pinions will be filed as promptly as the business of the court permits."

The opinion of Associate Judge HARRIS is joined by Associate Judges KELLY, KERN, and NEBEKER, Chief Judge NEWMAN and Associate Judges MACK, FERREN, and PRYOR join in Part II, and Associate Judge BELSON joins in Parts I, II, and III, of Associate Judge HARRIS' opinion.

Chief Judge NEWMAN and Associate Judges MACK, PRYOR, and BELSON join in Part III of the opinion of Associate Judge FERREN. Associate Judge BELSON also joins in Parts II, IV, and V of Associate Judge FERREN's opinion.

The dissenting opinion of Associate Judge MACK is joined by Chief Judge NEWMAN and Associate Judge PRYOR.

HARRIS, Associate Judge:

Before us in these consolidated cases are petitions for review of a decision of the Board of Elections and Ethics ("Board") which rejected certain petitions in support of an initiative for certification on the November 1981 ballot.[1] The initiative which was proposed, entitled the "District of Columbia Greater Educational Opportunities Through Tax Incentives Initiative of 1981" and known in abbreviated fashion as "Initiative Seven," concerned potential tax credits for tuition payments by District of Columbia taxpayers. Petitioner Dankman,

the proponent of Initiative Seven, sought reversal of the Board's decision, contending primarily that the Board erroneously interpreted one of its regulations. Intervenors Dixon, *et al.*, were the challengers to Dankman's initiative petitions before the Board.[2] They advocated affirmance of the Board's order, both for the reason assigned by the Board and on additional grounds which explicitly were rejected by the Board. By our order dated September 18, 1981, a division of the court set aside the Board's order and directed that the Board certify Initiative Seven for inclusion on the November 1981 ballot. On October 5, 1981, the court granted respondent's petition for rehearing en banc and vacated the September 18 order. Immediately following the en banc argument on October 13, we issued another order directing the Board to certify the initiative for placement on the ballot. The initiative was defeated decisively in the November 3 election. This opinion sets forth the reasons for our decision that the electorate was entitled to vote on the issue.

## I

A brief overview of the procedure for an initiative is appropriate. The Initiative, Referendum, and Recall Procedures Act of 1979[3] ("Initiative Act" or "Act") was enacted to allow the electors of the District of Columbia to propose laws and to present those proposals directly to the voters for approval or disapproval. See D.C.Code 1981, § 1–1302(10). The sponsor of an initiative, known as the proponent, first must submit his proposal to the Board of Elections and Ethics. Upon receipt of the proposed initiative measure, the Board assigns a number to it, prepares a short title and an impartial summary of its purpose, places it in proper legislative form, and certifies that

---

1. Because we are reviewing two petitions, for convenience we refer to Dankman as petitioner, to Dixon, *et al.*, as intervenors, and to the Board as respondent.

2. Council Chairman Arrington Dixon and several other members of the Council were among 36 persons who challenged the petitions before

the Board. Mayor Marion Barry originally lodged a challenge to the proponent's initiative petitions, but the Board dismissed it for want of prosecution. (Members of the Board are nominated by the Mayor and confirmed by the Council.)

3. D.C.Code 1981, § 1–1320.

the petition is in final form.[4] The proponent then has 180 days within which to secure the requisite number of valid signatures to enable the initiative to be placed on the ballot. The petition must be signed by at least five percent of the registered voters in the District of Columbia, and the total signatures submitted must include five percent of the registered voters in at least five of the city's eight wards.

After a signed petition has been submitted, the Board may refuse to accept the petition if it finds that the measure is not a proper subject for an initiative or referendum or that the petition contains any of the irregularities outlined in D.C.Code 1980 Supp., § 1–1116(k)(1)–(7). If the Board accepts the petition, it has 30 days in which to certify whether the number of valid signatures on the petition meets the qualifying distribution and percentage requirements.[5] The Board must post the petitions for public inspection for ten days, beginning on the third day after the petitions are filed. Within this time period, any voter may challenge the validity of any petition.

Petitioner Dankman was the proponent of Initiative Seven. On February 27, 1981, the proposed measure was submitted to the Board. On March 4, 1981, the Board adopted its short title, summary statement, and legislative form, and certified that the proposed petition was in compliance with the requirements of D.C.Code 1980, Supp., § 1–1116(h) [now D.C.Code 1981, § 1–1320(h)]. The relevant portion of that section provides that:

(1) *Before circulating the petition, the proposer shall submit the petition to the Board of Elections and Ethics, for verification that the form of the petition is in* compliance with the provisions of this section. * * *

(2) Each petition sheet or sheets for an initiative ... shall have attached ... a statement made under penalties of perjury ... which contains the following:

(A) The printed name of the circulator;

(B) The residence address of the circulator, *giving the street and number;*

* * * * * *

(E) That the circulator of such initiative or referendum petition sheet is a qualified registered elector of the District of Columbia; and

(F) The dates between which the signatures to the petition were obtained.[6]

The Board-approved initiative then was circulated among District of Columbia citizens by some 19 to 24 circulators. On June 29, 1981, petitioner presented a petition for filing containing 1,711 petition sheets and 27,415 signatures in support of the initiative.[7] The Board conducted a public hearing on the question of whether the measure presented was a proper subject for initiative. On July 6, the Board advised petitioner that it had, at a special meeting, approved the subject matter of Initiative Seven.[8] On that date, the Board also accepted the petitions for filing, finding that the petitions complied with the requirements of regularity outlined in D.C.Code 1980 Supp., § 1–1116(k).

The Board then had 30 days within which to ascertain the validity of the submitted signatures and, if their validity were established, to certify the initiative for placement on the ballot. This time period was interrupted, however, by the July 18 filing

---

4. If the proponent objects to any of these actions as taken by the Board, he may seek review in the Superior Court. *See* D.C.Code 1981, § 1–1320(e)(1).

5. If the Board refuses to accept the petition at this stage, the proponent may apply to the Superior Court for a writ in the nature of a mandamus to compel the Board to accept the petition. *See* D.C.Code 1981, § 1–1320(*l*).

6. Because the petitions had not then been circulated to voters, this information was not included on the statement attached to the petition.

7. According to testimony presented before the Board, there are about 272,000 registered voters in the District of Columbia, and 14,000 signatures are needed to place an initiative on the ballot.

8. At oral argument before us, the Board reiterated its position that the proposal was a proper subject for an initiative.

of two challenges to the petitions.[9] Intervenor Dixon—joined by Mayor Marion Barry and 34 others—lodged the following objections to the proponent's petitions: (1) the summary statement and the legislative text of the initiative were inconsistent and, therefore, the statement was misleading; (2) the notary public to the petitions, JoAnn Willis, had such an interest in Initiative Seven as to vitiate the signatures of the electors (see note 9, supra ); (3) the circulators of the petitions induced citizens to sign the petitions by false and misleading statements; (4) the proposer of Initiative Seven had failed to file a verified statement of contributions pursuant to § 1–1116(k)(1); and (5) some of the circulators were not qualified electors when they circulated the petitions, in violation of § 1–1116(h)(2)(E). Mayor Barry filed a separate challenge to the petitions which the Board later dismissed "because of the failure of any person to appear on his behalf to prosecute the challenge." See note 2, supra.

Following a hearing and the submission of briefs, on August 3 the Board sustained one of intervenors' challenges to the petitions. The Board overruled allegations of other defects assigned by intervenors, but found that the 22,624 signatures obtained by seven of the circulators working on petitioner's behalf were to be rejected because those circulators were not residents of the District of Columbia and, therefore, they could not be qualified electors. See D.C. Code 1980 Supp., § 1–1116(h)(2)(E). The Board concluded that "[t]heir lacking legal status to circulate the petition so tainted this Initiative # 7 and the electoral process that all of the signatures they obtained are rejected." The effect of sustaining intervenors' challenge—which meant the invalidation of the signatures of 22,624 voters—was to block Initiative Seven from appearing on the ballot. Notwithstanding its rejection of the collected signatures (and noting that "the Court could reverse the Board's deci-

sion"), on August 5 the Board announced the results of the random statistical sampling which verified the signatures submitted in favor of the initiative. Five of the eight wards met the required number of signatures with greater than 99 percent confidence; no decision was reached as to the other three wards because the requisite five wards already had been accepted. See id., § 1–1116(i).

## II

■ Dankman contended that the Dixon challenge to the Initiative Seven petitions was filed beyond the time period specified in the Initiative Act, D.C.Code 1980 Supp., § 1–1116(o ), thus rendering the Board without jurisdiction over the challenge. We disagree.

After the Board has accepted a petition for filing, it has 30 days in which to determine whether certification of the initiative for the ballot is appropriate. See D.C.Code 1980 Supp., § 1–1116(o ). During this time, the Board ascertains whether the number and validity of signatures on the initiative petition meet the Act's qualification standards. The Board must post the petitions for public inspection

> for ten (10) days, including Saturdays, Sundays, and holidays, beginning on the third day after the petitions are filed. Any qualified elector may, within such ten (10) day period, challenge the validity of any petition, by a written statement duly signed by the challenger and filed with the Board, specifying concisely the alleged defects in such petition. [Ibid.]

Petitioner urged that the language "after the petitions are filed" means that the challenge period (commencing three days after filing and then running for ten days) is triggered when a proponent submits his petition to the Board for filing after securing the appropriate number of valid signatures. Id., § 1–1116(j)(1). Having submitted his

9. On July 9, 1981, intervenor Dixon had requested that the Board investigate the notarization of the petitions. (We note that the statute does not require notarization of the petitions.) He alleged that the notarization of the petitions

by JoAnn Willis, a District of Columbia notary and a backer of Initiative Seven, violated the provisions of D.C.Code 1973, § 1–501. The Board, concurring with the recommendation of its General Counsel, rejected that contention.

petitions for filing on June 29, 1981, petitioner argued that the Dixon challenge of July 18, 1981, came after the specified time period had lapsed.

The section of the Initiative Act providing for challenges by qualified electors, § 1–1116(*o*), speaks of the procedure for the Board to follow "[a]fter acceptance of an initiative or referendum petition." Thus, the operation of that section is premised on the Board's having accepted the petitions. Petitioner's submission of the petitions alone cannot set the procedures outlined in § 1–1116(*o*) into motion. Once the Board accepts the submitted petitions, the Board's 30-day certification period and the challenge period begin to run. Such an interpretation of § 1–1116(*o*) is consistent with a regulation validly promulgated by the Board, which provides that initiative petitions shall be available for public inspection for ten days "beginning on the third (3rd) day after the petition has been accepted for filing." 3 D.C.M.R. 66, § 1010.1.

Petitioner points to language in *Citizens Against Legalized Gambling v. Board of Elections and Ethics*, 501 F.Supp. 786, 788 (D.D.C.), *aff'd per curiam*, No. 80–2251 (D.C.Cir., Oct. 28, 1980), which appears to indicate that the clock starts running on the ten-day posting period from "[t]hree days after a petition is submitted." However, a reading of that passage in isolation is misleading because the District Court—at least implicitly—read § 1–1116(*o*) as providing that the opportunity for qualified electors to challenge the petitions exists only after the Board has accepted the petitions for filing. The District Court stated:

> The Board has an independent duty to assure sufficiency. The 10-day period for opponents cannot be viewed in isolation from the 30-day period during which the Board must complete all its work. It is reasonable to conclude that if opponents to an initiative present strong evidence of

petition insufficiencies within the first 13 days of the 30-day period (by using the full 10-day span allotted opponents, following the initial 3-day period prior to posting), this may well affect the Board's decision as to how carefully the petition will be verified. [*Id.*, at 789–90.]

The court recognized that the two time periods run concurrently. It follows that, since the Board's time period starts only after its acceptance of the petitions for filing, then likewise the challenge period must begin with the acceptance of the petitions.

■ The Board accepted the initiative petitions on July 6, 1981, and the ten-day period for challenging them began three days later, on July 9. Accordingly, the July 18 challenge was timely, and the Board had jurisdiction to hear it.

### III

Petitioner Dankman maintained that the Board improperly disregarded one of its own regulations in finding that the status of some of the petition circulators as apparently non-qualified electors invalidated the otherwise admittedly valid signatures which they had obtained. Before circulating the petition, Dankman had submitted it, together with the circulators' statements of qualification, to the Board on February 27, 1981, for the Board's determination that the form of the petition complied with statutory requirements. *See* D.C.Code 1980 Supp., § 1–1116(h). One such requirement is that "a statement made under penalties of perjury" be attached to the petition declaring "that the circulator of such initiative or referendum petition sheet is a qualified registered elector of the District of Columbia." *Id.*, § 1–1116(h)(2)(E). The Board certified on March 4, 1981, that the initiative was in final form and in compliance with the requirements set forth in § 1–1116(h)(2).[10]

---

10. Because the statute provides that the circulators' statements are made under penalties of perjury, criminal sanctions are available for those who do not comply. Indeed, the Board referred the challenged statements of the seven circulators to the United States Attorney for possible prosecution for violation of D.C.Code 1980 Supp., § 1–1114, governing the making of false statements and other corrupt practices in the initiative petition process. *The Board's*

Nevertheless, at the hearing on intervenors' challenge, the Board ruled that seven of the circulators working on petitioner Dankman's behalf were not qualified electors because they were not residents of the District. *See* note 20, *infra.* However, a Board regulation specifically provides that the failure of a circulator to be a registered qualified elector does not invalidate the signatures of persons who are registered qualified electors. Board Rule 1607.9, 3 D.C.M.R. 64, § 1008.9.[11] Despite that regulation, the Board ordered that the 22,624 signatures collected by those seven circulators be rejected—on the sole basis of the circulators' status—concluding that both Initiative Seven and the electoral process had been "tainted."

No petition for review was directed to the regulation, which had been in effect for well over a year. In the only instance in which the regulation has been challenged, its validity was upheld. *Citizens Against Legalized Gambling, supra.* Because the United States Court of Appeals found "it unnecessary to rule upon the validity of Board Rule 1607.9 [Rule 1008.9]" in affirming the judgment in that case (by an unpublished order), the determination by the District Court that the regulation is valid is unimpaired.

 As a validly promulgated and unchallenged regulation, Rule 1008.9 is binding upon the Board. *National Conservative Political Action Committee v. Federal Election Commission,* 200 U.S.App.D.C. 89, 95, 626 F.2d 953, 959 (1980) (per curiam); *Panhandle Eastern Pipe Line Co. v. Federal Energy Regulatory Commission,* 198 U.S.

App.D.C. 387, 402, 613 F.2d 1120, 1135 (1979), *cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980) (an agency should not "have authority to play fast and loose with its own regulations"); *United States Lines, Inc. v. Federal Maritime Commission,* 189 U.S.App.D.C. 361, 368 & n.20, 584 F.2d 519, 526 & n.20 (1978); *Zotos International, Inc. v. Kennedy,* 460 F.Supp. 268, 275 (D.D.C.1978) ("It is axiomatic that once an agency commits itself in its regulations to adhering to certain principles or procedures, it cannot violate them."). Moreover, the regulation has the force and effect of law. *Atwood's Transport Lines, Inc. v. United States,* 211 F.Supp. 168, 170 (D.D.C.1962), *aff'd mem.,* 373 U.S. 377, 83 S.Ct. 1312, 10 L.Ed.2d 420 (1963) ("Rules and regulations promulgated by Governmental establishments pursuant to statutory authority have the force and effect of law, and concededly are subject to the same tests as statutes."). The Board, then, like every administrative agency, was required to adhere to its own regulation. *Vitarelli v. Seaton,* 359 U.S. 535, 539–40, 79 S.Ct. 968, 972–973, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 388–89, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 268, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954).

During the hearing before the Board, the Chairman indicated for the first time that Board Rule 1008.9, dealing with the effect of a circulator's status on the otherwise valid signatures he collects, apparently would not be given its facially plain meaning. Presaging the Board's subsequent fallacious application of the regulation, the Chairman announced:

---

General Counsel represented at the hearing on intervenors' challenge that, at the direction of the Board, even prior to the actual filing of the petitions and the hearing, he had taken the circulators' names and copies of their mail registration applications to the United States Attorney.

11. The Board is an independent agency of the District of Columbia government which is charged with administering the city's election laws. *See* D.C.Code 1981, § 1–1306. As noted, its members are appointed by the Mayor, with the advice and consent of the Council. *See id.,* § 1–1303. The Board is empowered by

statute to promulgate rules and regulations for the implementation of the Initiative Act. *Id.,* § 1–1324. To that end the Board adopted a rule which states unequivocally:

The failure of the circulator of an initiative or referendum petition to be a registered qualified elector will not invalidate the signature of an otherwise registered qualified elector. [Board Rule 1607.9; 3 D.C.M.R. 64, § 1008.9.]

That rule was published in the D.C. Register on June 6, 1980, and became law on July 16, 1980. 27 D.C.Reg. 2450, 3234 (1980).

I would like to say at the beginning that we have all of your legal objections in our mind, Mr. Mayberry [counsel for petitioner Dankman], but I hope that you are appreciative that serious allegations have been made.

The Board wants to put you on notice that you should not place too great a reliance on the Section 1008.9 of our rules. We are not saying that your argument on that particular point does not have merit. We have not passed on it, but I certainly want you to understand that it is possible that that rule could be considered to apply to a situation different from this one.

So, for the purpose of preparing your response, I understand you have relied on it as a matter of law, but I think we ought to warn you that it would be dangerous to put too much reliance on that as a matter of law.

Consistent with those admonitions, the Board, in its findings of fact, acknowledged the existence of Rule 1008.9, but stated that it "believe[d]" the rule was not intended to cover the situation presented by the seven challenged circulators. The Board concluded "[t]hat the intent of Board Rule 1008.9 is to cover those instances in which the circulator failed to be registered due to his or her inadvertence to register, or a candidate or proponent reasonably believes the circulator is a qualified elector, and the number of signatures involved was *de minimis.*"

■ Unless plainly erroneous, an agency's interpretation of its own regulation will be accorded deference. *Snider v. Board of*

*Appeals and Review,* D.C.App., 342 A.2d 50, 51 (1975); *Sellers v. District of Columbia,* D.C.Mun.App., 143 A.2d 96, 98 (1958); *Wright v. Paine,* 110 U.S.App.D.C. 100, 102, 289 F.2d 766, 768 (1961). Our review of the Board's application of its regulations is governed by a standard of reasonableness. "[W]hen the Board attempts to apply its own regulations, we cannot substitute our judgment if the Board's application is reasonable." *Pendleton v. Board of Elections and Ethics,* D.C.App., 433 A.2d 1102, 1105 (1981) (per curiam), citing *In re Haworth,* D.C.App., 258 A.2d 447 (1969); *see* D.C.Code 1978 Supp., § 1–1108(p)(2).

■ Here the plain meaning of the regulation prohibits the whimsical applicability given it by the Board to the facts of this case.[12] Board Rule 1008.9 means what it says: a defect in the circulator's status does not invalidate the signatures he has gathered. The possible sins of the circulator are not to be visited upon the electors who signed petition sheets in good faith. The clear phrasing of the regulation does not contain a single qualifier—not for inadvertence, not for reasonable belief about a circulator's status, and not for the quantity of signatures called into question.[13] Accordingly, we cannot conclude that the Board's interpretation of its rule was reasonable. We find that the Board's interpretation—which served to qualify the rule into oblivion—was plainly erroneous and restricted rather than implemented the basic purpose of the Initiative Act. That purpose, in the final analysis, is to permit the electorate to

---

12. In redefining its Rule 1008.9 so as to render it applicable in only three circumscribed situations, the Board provided no explanation for its action. It spoke only of its belief about the intent of the rule. Mere belief cannot replace the type of reasoned administrative analysis which properly accompanies an agency's interpretation of its regulation. The Board failed to "provide a rational explanation for [its] departure" from its regulation. *National Conservative Political Action Comm. v. Federal Elections Comm'n, supra,* 200 U.S.App.D.C. at 95, *626* F.2d at 959. The total lack of explication of its novel view of the rule further convinces us that the Board erred in looking beyond the rule's plain meaning.

13. The Board's argument that one of the three instances in which Rule 1008.9 was intended to operate was when "the number of signatures involved was *de minimis*" seems particularly unpersuasive given that the Board already has at its disposal another of its rules which covers that situation. Board Rule 1010.5 provides that:

> The Board may, on its own motion, dismiss a petition challenge as moot where the total number of challenged signatures would not reduce the total number of signatures submitted by the proposer(s) below the required statutory amount. [3 D.C.M.R. 66, 27 D.C. Reg. 2452, 3234 (1980).]

vote on appropriate issues. *See* D.C.Code 1981, § 1–1324; 25 D.C.Reg. 9454 (1979); *cf. Citizens Against Legalized Gambling, supra,* 501 F.Supp. at 789 (initiative legislation to be liberally construed).

We note that our view of the rule is consistent with the overall tenor of the Initiative Act which prevents "harmless error" in the signature collection process from vitiating the validity of the petitions. *See, e.g.,* D.C.Code 1981, § 1–1320 (if "the same person has signed a petition for the same initiative or referendum measure more than once, [the Board] shall count only one (1) signature of such person"; if a person signs a petition but indicates the wrong ward as his residence, "such person shall be counted from the correct ward in determining whether or not an initiative or referendum measure qualifies for the ballot."). The paramount concern must be with the validity of the signatures on the petitions, for "[t]o deny the persons who signed these petitions the chance to have those signatures count—solely because of misconduct by others that does not cast doubt on the signatures themselves—would force this Court to stand on form rather than substance." *Citizens Against Legalized Gambling, supra,* 501 F.Supp. at 790; *cf. Pendleton v. Board of Elections and Ethics, supra,* 433 A.2d at 1104 ("Our purpose in reviewing elections is merely to insure that no voter was disenfranchised through improper interpretation by the Board.").[14]

IV

The Dixon challengers not only intervened in Dankman's petition for review, but also filed their own petition for review of the Board's determination, asking that we affirm the Board's order for reasons other than those upon which the Board relied. They urged that the Board erred in not premising its rejection of the initiative petitions on the additional grounds that (1) the summary statement was misleading; (2) the petitions were notarized improperly; and (3) the proponents failed to file a verified statement of contributions before the petitions were accepted.

Intervenors assert standing to advance such arguments under D.C.Code 1978 Supp., § 1–1108(p)(2), which provides that

[w]ithin three days after announcement of the determination of the Board with respect to the validity of the nominating petition, either the challenger or any person named in the challenged petition as a nominee may apply to the District of Columbia Court of Appeals for a review of the reasonableness of such determination. The court shall expedite consideration of the matter and the decision of such court shall be final and not appealable.[15]

That provision alone, however, cannot clothe a party with automatic standing to challenge unfavorable rulings by an agency. As we stated in *Lee v. Board of Appeals and Review,* D.C.App., 423 A.2d 210, 215 (1980), "we may entertain only petitions

14. In light of our treatment of the Board's interpretation of Rule 1008.9, we need not reach petitioner's other asserted grounds for reversal.

15. This section of the Code, contained in the provisions for challenging petitions for nominees to the Board of Education, was made applicable to challenges to initiative petitions by D.C.Code 1980 Supp., § 1–1116(*o*). Because the incorporated provision relates to the Board of Education, its language, when applied to the initiative procedure, is imprecise and does not mesh with the parties or terms found elsewhere in the Initiative Act. Nonetheless, that obscure statute provides the linchpin for Judge FERREN'S tortuous analysis. He concludes: "Although this [Board of Education] statute does not expressly deal with the scope

of the right to intervene, it reflects a policy of equal access to this court by sponsors and challengers of petitions." [*Post,* p. 523] D.C. Code 1978 Supp., § 1–1108(p)(2), does not deal remotely, much less expressly, with intervention, yet Judge FERREN parlays that language—as part of the governing statute—into a license to circumvent the "aggrieved" requirement for standing. By allowing intervenors to raise "all available legal arguments" [*post,* p. 525] and by refusing to limit their role to supporting the Board's order, Judge FERREN cloaks intervenors with all the rights of petitioners—quite unpersuasively sidestepping the bedrock requirement that those who appeal must show that they are injured by the administrative tribunal's action.

brought by 'any person suffering a legal wrong, or adversely affected or aggrieved, by an order of decision of the Mayor or an agency in a contested case . . . .' D.C.Code 1978 Supp., § 1–1510." The Dixon group has failed to show that it was affected adversely by the Board's order. Nor can it point to any injury. Because the Board sustained their challenge to the proponent's petitions, the Dixon group, unlike petitioner Dankman, cannot be considered to have been aggrieved by the order. Dixon, et al., thus lack standing to appeal the Board's order in their favor. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, ——, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980); *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 18 n.17, 71 S.Ct. 534, 542 n.17, 95 L.Ed. 702 (1951); *Public Service Commission v. Brashear Freight Lines, Inc.,* 306 U.S. 204, 206, 59 S.Ct. 480, 481, 83 L.Ed. 608 (1939) (per curiam) (Commission, as successful party below, has no standing to appeal lower court's decree); *Sea-Land Service, Inc. v. International Longshoremen's Association,* 625 F.2d 38, 40 (5th Cir. 1980); *Burleson v. Coastal Recreation, Inc.,* 572 F.2d 509, 511 (5th Cir. 1978) ("Ordinarily only a litigant who was a party below and who is aggrieved by the judgment or order may appeal."); *Pepsico, Inc. v. FTC,* 472 F.2d 179, 186 (2d Cir. 1972), *cert. denied,* 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973) ("The notion that being a 'party' before an agency either automatically confers or is a necessary condition of the right to judicial review [is no longer valid]."); *Koehne v. Harvey,* D.C.Mun.App., 39 A.2d 871, 872

(1944) (per curiam) (successful party below lacks standing to appeal because "he is in no position to complain that he is aggrieved by his own success"); 73 C.J.S. *Public Administrative Bodies and Procedure* § 176 (1951) ("As a general rule an administrative ruling or decision must result in prejudice to the rights of a person before he may secure a judicial review thereof."); *cf. Fuller v. Branch County Road Commission,* 520 F.2d 307, 309 (6th Cir. 1975) (per curiam) (party to a consent decree who has been accorded the relief he agreed to is not considered aggrieved and may not appeal from order dismissing complaint). Accordingly, we would dismiss the petition to review in No. 81–978.[16]

Obviously, as parties to the proceeding below, Dixon, *et al.,* may be heard as intervenors in Dankman's petition for review. *See* D.C.App.R. 15(g). Our rule governing intervention, Rule 15(g), grants automatic intervention status to anyone who was a party to the proceeding before the agency. No member of the court disputes Dixon, *et al.'s* right to intervene in Dankman's petition. Rather, the question is the permissible scope of intervention. We conclude that the Dixon intervenors may not broaden the scope of contested issues but rather only may support the reasons assigned by the Board for its decision.

The limitations upon the intervenors' function emanate from the nature of appeals from agency determinations. In a petition for review of an order in an administrative proceeding, the petitioning losing party does no more than attack some aspect of the lower tribunal's order, leaving the tribunal itself to defend its actions. By

---

**16.** Consistent with that conclusion, we note that when we review agency action, we are not permitted to uphold an agency's order unless the grounds upon which the agency relied are the *same ones* upon which its action can be sustained. *SEC v. Chenery Corp. (II),* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *SEC v. Chenery Corp. (I),* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

Because of the expectation that we would dismiss Dixon, *et al.'s* petition, our October 13, 1981, remand to the Board with directions to

certify Initiative Seven for inclusion on the ballot was entirely proper. Intervenors' petition simply could not be entertained for failure to satisfy the basic "aggrieved" requirement for standing; thus we need not reach the merits of the additional arguments they raise. The remand did nothing "to cut off judicial review rights guaranteed by statute." [*Post,* p. 524 n.15.] It merely informed the Board that it had committed an error of law and directed it to correct the error—which was the sole impediment to placing the initiative on the ballot.

procedural design, the agency carries the burden of supporting its decision and occupies a defensive role. To permit an intervenor not only to lend its voice in support of the Board's action but also to assert additional grounds which had been rejected by the agency would afford an intervenor the power effectively to convert agency challenges into litigation between the private parties to the agency proceeding.[17] *See* 9 Moore's Federal Practice § 215.07 (2d ed. 1980); Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv.L.Rev. 721, 727, 754 (1968) ("When one is granted intervention, either as of right or in the exercise of discretion, it does not necessarily follow that he must be granted all the rights of a party at the trial and appellate levels. * * * Yet it should not follow from the right to intervene on a given issue that the intervenor obtains all the rights of a party with respect to every issue."); *cf. Credits Commutation Co. v. United States*, 177 U.S. 311, 315–16, 20 S.Ct. 636, 638, 44 L.Ed. 782 (1900) (denial of motion to intervene appropriate where questions raised by intervenors would be handled better in separate suit).

The grant of such unintended power would enable an intervenor to come into a review proceeding to assert a point of view wholly independent from either the Board's or petitioner's position. Such an expansive role for an intervenor would run contrary to the intent of the intervention rule, which simply seeks to assure that issues unavoidably addressed by the court are not resolved in the absence of proper representation. Here, Dixon, *et al.*, attempt to inject issues into the appellate phase of the litigation that neither the Board nor petitioner saw fit to contest.[18]

A majority of the court, unquestionably swayed by the fact that this is an election case in which the constraints of time are narrow, concludes that the mere label of "intervenor" should permit a party to such a case to raise all issues with which it is concerned, notwithstanding the positions taken by the petitioner and the respondent agency. Their purported justification for such a holding is threefold: (1) the intervenors' position as the prevailing party is put in jeopardy when the losing party files a petition for review;[19] (2) the Initiative Act provides for equal access to the courts (only, we note, by the losing party); and (3) in an election case, time is of the essence. We find these reasons totally unpersuasive. The first argument falls short of showing how intervenors satisfy the "aggrieved" re-

17. The concurrence's reliance on *International Union, United Automobile Aerospace & Agriculture Implement Workers of America v. Scofield*, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965) (*Scofield*), to reach the opposite conclusion is misplaced. First of all, the Supreme Court expressly limited its holding to Labor Board review proceedings. *Id.* at 210, 86 S.Ct. at 377. *Scofield* holds that both the successful charged party and the successful charging party have a right to intervene in a court of appeals review proceeding under § 10(f) of the National Labor Relations Act, which does not explicitly provide for intervention at the appellate level. That outcome tracks our own Rule 15(g) by allowing those who were parties below to intervene on appeal. Assuredly *Scofield* does not purport to open the door for intervenors to replay the entire agency proceeding at the appellate level. Such a result would mean that every question resolved by an agency would receive virtually de novo review by the appellate court, an absurd result which unquestionably was not intended by Congress.

18. Contrary to Judge FERREN'S assertion, the introduction of additional issues does serve to "expand the litigation beyond its original scope" [*post*, p. 525], because the petitioner and the respondent frame the issues on appeal before the intervenor becomes a meaningful party.

19. Judge FERREN refers to the "elementary proposition" that Dixon, *et al.*, would not have had standing to petition for review if Dankman had not done so first. [*Post*, p. 522 n.10.] For Judge FERREN, a different situation mystically arose once Dankman filed a petition for review. That is, according to Judge FERREN'S analysis, the contingent jeopardy faced by Dixon, *et al.*, somehow clothes them retroactively with standing as parties who were "aggrieved" by their originally having prevailed at the agency level. This argument lacks any basis in law or reason. The relevant question remains: Was the party aggrieved by the Board's order? Events subsequent to the entry of the Board's order, in this case Dankman's filing of a petition for review, cannot alter the answer to that basic, indeed "elementary," question.

quirement for standing to enable them to advance arguments other than those raised by the original parties to the appeal. The statutory argument is similarly unavailing, as the relevant Code provision simply assures that the Board's decision is reviewable on petition by the losing party. In any event, there is no sound justification for reading the statute as according intervenors all the rights of a petitioner, and, thereby, to eviscerate the requirements of standing. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., supra,* —— U.S. at —— n.24, 102 S.Ct. at 766 n.24. As for the third justification, while time certainly is of the essence, that truism may not be invoked to overturn established precedent governing the exercise of judicial power.

In their proscribed role as intervenors, to which we would limit them, Dixon, *et al.*, argue that the Board's order should be upheld because: (1) intervenors' challenge was timely; (2) the Board correctly construed its Rule 1008.9; and (3) the circulators were not qualified registered electors as required by D.C.Code 1980 Supp., § 1–1116(h)(2)(B), (E).[20] We already have disposed of intervenors' first two arguments. *See ante,* at II and III. Because of our holding regarding the appropriate construction of Board Rule 1008.9, we need not reach intervenors' last contention in support of the Board's order. Even if we were to conclude that the Board properly found that seven of the circulators were not qualified registered electors, Rule 1008.9 prevents that circumstance from posing a fatal defect to the petitions.

FERREN, Associate Judge, concurring in the result:[1]

The Board of Elections and Ethics has adopted a rule expressly providing, without

exception, that "[t]he failure of the circulator of an initiative or referendum petition to be a registered qualified elector will not invalidate the signature of an otherwise registered qualified elector." Board Rule 1607.9; 3 D.C.M.R. 64, § 1008.9. I believe that Rule 1607.9 is valid, and that the Board violated this rule when it rejected petitions containing 22,624 signatures. Accordingly, I conclude that the Board must certify Initiative # 7 for the November 1981 ballot.

### I.

The record supports the Board's conclusion that "circulators of petitions supporting Initiative # 7, who obtained 22,624 signatures (82.52%), were not residents of the District of Columbia . . . ." Board Conclusion of Law 8. It follows that none could be "a qualified registered elector of the District of Columbia," a status required of everyone who circulates an initiative petition. D.C.Code 1980 Supp., § 1–1116(h)(2)(E). Despite this clear requirement of the law, however, these circulators—sponsored by a local committee of the National Taxpayers Union—directed a virtual blitz of petitions at the District of Columbia electorate. I agree with the Board, and with my dissenting colleagues, that the evidence reflects "a manipulation of the initiative process in direct violation of statutory direction . . . ." Board Order at 14.

This "manipulation," however, is not conclusive here, for the record establishes three other important facts:

*First,* no one questions that the signatures on the petitions filed in support of Initiative # 7—a total of 27,415—are authentic signatures of "qualified registered electors." D.C.Code 1980 Supp., §§ 1–

---

**20.** As we have noted, D.C.Code 1980 Supp., § 1 1116(h)(2)(E), provides that each petition shall have a statement attached to it "that the circulator of such initiative or referendum petition sheet is a qualified registered elector of the District of Columbia." The term "qualified elector" is defined as

a citizen of the United States (A) who resides or is domiciled in the District and who does

not claim voting residence or right to vote in any State or Territory; (B) who is, or will be on the day of the next election, eighteen years old; and (C) who is not mentally incompetent as adjudged by a court of competent jurisdiction. [*Id.,* 1978 Supp., § 1–1102(2).]

**1.** I concur in the judgment of reversal and in Part II of Judge HARRIS' opinion.

1116(g)(1), −1116(h)(2)(D), −1116(i). The Board verified the signatures through random statistical sampling. Accordingly, this is not a case where the failure of the circulators' qualifications raised questions about the genuineness of the petitioners' signatures.[2]

*Second,* although intervenors alleged that "unnamed circulators made misleading and deceptive statements to potential signatories to the petition," the record supports the Board's finding that the evidence presented to substantiate those allegations "was meager and inconclusive." Board Finding of Fact No. 6.[3]

*Third,* without regard to the legal or policy merits of the tax credit proposal, the Board concluded at its meeting of July 1, 1981, that the proposal is a "proper subject" for a citizens initiative. D.C.Code 1980 Supp., § 1–1116(k). No one challenges that conclusion.[4]

Consequently, we confront a question that no other court, to my knowledge, has had to consider: When the Board has accepted petitions containing a proper subject for an initiative, verified that a sufficient number of qualified registered electors have signed them, and concluded that the evidence fails to support allegations that the circulators made misleading and deceptive statements, does the fact that disqualified, nonresident circulators solicited 82.52% of the signatures warrant a decision that the initiative shall not reach the ballot?

## II.

Initially, we confront a relevant, possibly determinative, Board rule:

The failure of the circulator of an initiative or referendum petition to be a registered qualified elector will not invalidate the signature of an otherwise registered qualified elector. [Board Rule 1607.9; 3 D.C.M.R. 64, § 1008.9.]

The Board adopted Rule 1607.9 pursuant to its statutory authority to "issue rules and regulations" to implement the Initiative, Referendum, and Recall Procedures Act of 1979, D.C.Code 1980 Supp., § 1–1119.1 (Initiative Procedures Act).

A. At oral argument, intervenors Dixon, *et al.,* took the position that Rule 1607.9 is void; they contended the Board had no authority to adopt the rule because the statute, properly construed, mandates disqualification of signatures collected by disqualified circulators. I·disagree.

The statute requires the Board to "refuse to accept" signed petitions if they embody one or more specified defects which typically are visible when the petitions are presented. *See* D.C.Code 1980 Supp., § 1–1116(k).[5] The statute, however, does not

---

**2.** *Cf. Whitman v. Moore,* 59 Ariz. 211, 230, 125 P.2d 445, 455 (1942) (absence of circulator's certificate "requires that the names should be stricken in the absence of affirmative evidence that those signing were qualified electors."), *overruled, in part, on other grounds, Renck v. Superior Court of Maricopa County,* 66 Ariz. 320, 187 P.2d 656 (1947).

**3.** *See, e.g., Reynolds v. Hall,* 222 Ark. 478, 481, 261 S.W.2d 405, 408 (1953) (sustained demurrer to alleged conspiracy of liquor dealers to solicit signatures, through false representations, for referendum to oppose increased liquor taxes).

**4.** *Compare Convention Center Referendum Committee v. District of Columbia Bd. of Elections and Ethics,* D.C.App., 441 A.2d 889 (1981).

**5.** D.C.Code 1980 Supp., § 1–1116(k) provides:
Upon submission of an initiative or referendum petition by the proposer to the Board of Elections and Ethics, the Board shall refuse to accept the petition if the Board finds that the measure presented is not a proper subject for initiative or referendum, whichever is applicable, under the terms of title IV of the District of Columbia Self-Government and Governmental Reorganization Act, as amended, or upon any of the following grounds:
(1) the verified statement of contributions has not been filed pursuant to sections 1–1134 and 1–1136; or
(2) the petition is not in the proper form established in subsection (g) of this section; or
(3) the time limitation established in subsection (j) of this section within which the petition may be circulated and submitted to the Board has expired; or
(4) the petition on its face clearly bears an insufficient number of signatures; or

specify what should be done when the Board detects an irregularity *after* accepting the signed petitions for filing. *See id.*; 3 D.C.M.R. 66, § 1010.1. The thirty-day period during which the Board is to count and validate signatures includes a ten-day period for the public to inspect and challenge the petitions, *see* D.C.Code 1980 Supp., § 1–1116(*o*); and yet the statute fails to establish remedies for irregularities found during this very period when scrutiny is invited. Under these circumstances, the Board has authority to interpret the statute by adopting reasonable rules and regulations. D.C.Code 1980 Supp., § 1–1119.1; *see District of Columbia v. Catholic University of America*, D.C.App., 397 A.2d 915, 919 (1979).

It is consistent with the statute for the Board, in such circumstances, to limit sanctions for unlawful solicitation to the criminal process. *See* D.C.Code 1980 Supp., §§ 1–1114(b), –1116(h)(2).[6] Absent a statutory provision to the contrary, the Board is not required to keep an otherwise proper initiative off the ballot. *Citizens Against Legalized Gambling v. Board of Elections and Ethics*, 501 F.Supp. 786, 790–91 (D.D.C. 1980) ("noncompliance by the circulator need not—as a matter of law—invalidate any signature so long as the criminal sanctions are pursued") (footnote omitted), *aff'd per U.S.App.D.C.R. 13(c)*, No. 80–2251 (D.C.

Cir., Oct. 28, 1980); *Edwards v. Hutchinson*, 178 Wash. 580, 584, 587, 35 P.2d 90, 92, 93 (1934) (solicitation of signatures by unlawfully paid workers does not "invalidate[ ] the signature of a legal voter"; legislature intended "penal provisions as the sole safeguards for the proper operation of the law, except wherein it has specifically provided other safeguards").

More specifically, in adopting the Initiative Procedures Act, the Council required that circulators must be qualified registered electors, in order "to insure the greatest degree of integrity in the signature solicitation process." Committee Report, District Council Committee on Governmental Operations, Jan. 31, 1979, at 4. Presumably this means that the Council wanted to minimize the potential for corruption of the initiative process, with the ultimate goals of assuring that only qualified registered electors sign petitions and that their signatures are based on complete and accurate information. In adopting Rule 1607.9, the Board clearly indicated that when these goals have been achieved, the Board need not invalidate otherwise proper signatures because they were collected by disqualified circulators. The Board implied that circulation by non-registered voters did not, per se, constitute a corruption of the electoral process.[7] That judgment is within the Board's prerogative.

---

(5) the petition sheets do not have attached to them the statements of the circulators as provided in subsection (h) of this section; or

(6) the petition authorizes, or would have the effect of authorizing, discrimination prohibited under the Human Rights Act of 1977 (D.C.Code, sec. 6–2201 et seq.); or

(7) the petition presented would negate or limit an act of the Council of the District of Columbia pursuant to section 47–224.

In the case of refusal to accept a petition, the Board shall endorse on the petition the words submitted but not accepted and the date, and retain the petition pending appeal. If none of the grounds for refusal exists, the Board shall accept the petition.

**6.** D.C.Code 1980 Supp., § 1–1114(b) provides *for up to* one year in prison and/or up to a $10,000 fine as a penalty for false statements or other corrupt practices in the initiative, referendum, or recall petition process. In addition, D.C.Code 1980 Supp., § 1116(h)(2) provides

that the circulator's statement attached to the petition is made under "penalties of perjury."

**7.** One can argue persuasively that if a voter knew that a particular circulator was a nonresident lobbyist, this very fact might influence whether the voter would sign the petition. It might follow that a solicitation in which this fact is not disclosed is inherently misleading, and that the "integrity" purpose behind the residency requirement for circulators could not be met unless the Board were to reject all signatures solicited by disqualified circulators. The Board, however, is not compelled to take this view—and it did not. *Compare Direct Sellers Association v. McBrayer*, 109 Ariz. 3, 503 P.2d 951, 953–54, *vacating* 16 Ariz.App. 231, 492 P.2d 727 (1972) (interpreting statute that expressly provided that solicitations by persons other than qualified electors shall be void and not counted in determining the legal sufficiency of the petition).

B. When considering Initiative # 7, however, the Board changed its policy. Despite the unequivocal language of its rule the Board rejected the 22,624 valid though illegally obtained signatures, stating that this was necessary "to preserve the integrity of the initiative process." Board Conclusion of Law 8. The Board stated that Rule 1607.9 only "was intended to cover situations in which a circulator inadvertently was not registered at the time of signature collection or circumstances in which a candidate or proponent of an initiative reasonably believed a circulator was registered, or finally situations in which a small number of signatures is involved." Board Order at 14.

The problem is that Rule 1607.9 does not specify these limitations. I am unimpressed by the Board's argument that, in interpreting its own unqualified rule, the Board can redefine it retroactively to mean what perhaps it could say but plainly does not. *See United States v. Nixon*, 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–3101, 41 L.Ed.2d 1039 (1974); K. Davis, 2 Administrative Law Treatise § 7:21 (1979); *cf. Junghans v. Department of Human Resources*, D.C. App., 289 A.2d 17, 25 n.13 (1972) ("failure of a government body to conform to its own procedural rules may render its action invalid"). I believe the integrity of the democratic process depends on the Board's faithfully applying its own clear rule, ill-advised or not. For me, therefore, this case turns on the rule. If the Board wants to modify it, the Board has authority to do so—prospectively.

C. In summary, the record reflects that the signatures on the petitions accepted by the Board are genuinely those of qualified registered electors; the Board properly found that the evidence introduced to support the charge that signatures were collected on the basis of misleading and decep-

tive statements was "meager and inconclusive"; and no one questions the Board's conclusion that the tax credit proposal is a proper subject for a citizens initiative. The registered voters who signed these petitions presumably did so in good faith, believing the initiative process was functioning properly. Board Rule 1607.9 provides, without exception, that a circulator's own disqualification shall not invalidate the signatures of qualified registered voters. The question, then, is whether that rule should be interpreted (or voided) so as to deny those who signed petitions the opportunity to present an initiative to the voters, for the *sole* reason that the circulators responsible for most of the signatures came from outside the District. I conclude not.

### III.

In No. 81–978, Dixon, *et al.*, have petitioned for review of the three contentions they lost before the Board: the summary statement of the initiative bill was misleading, the petitions were improperly notarized, and the proponents failed to file a timely verified statement of contributors. We consolidated this petition with Dankman's petition for review, No. 81–977, in which Dixon, *et al.*, intervened to support the Board's ruling.

■ Part IV of Judge HARRIS' opinion raises the question whether Dixon, *et al.*, have standing to advance the arguments in this court that they lost before the Board. I conclude that they do have standing, and that the questions they have raised are within our scope of review, but that the Board properly rejected their arguments on the merits.

A. Judge HARRIS acknowledges that Dixon, *et al.*, may intervene as of right in No. 81–977 to support the Board's ruling. D.C.App.R. 15(g); [8] *see International Un-*

---

8. D.C.App.R. 15(g) provides:
 INTERVENTION. A party to the proceeding before the agency who desires to intervene in this court shall serve upon all parties to the proceeding and file with the clerk of this court one copy of a notice of intention to intervene whereupon said party shall be

deemed an intervenor without the necessity of filing a motion. Any other party who desires to intervene shall file a motion containing a concise statement of the interests of the moving party and the grounds upon which intervention is sought. The notice of intention or motion for leave to intervene

*ion, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, Local 283 v. Scofield*, 382 U.S. 205, 210–11, 86 S.Ct. 373, 377, 15 L.Ed.2d 272 (1965) (*Scofield*).[9] In order to evaluate the proper scope of intervention (*i.e.*, the range of arguments an intervenor is allowed to make), it is important to understand, first, why intervention itself is permitted.

A challenging party who prevails before the agency no longer is aggrieved once the agency issues its order.[10] A petition for review, however, puts in jeopardy, once again, the very rights and interests that the newly-prevailing party had sought to protect. If the challenger's success before the agency were deemed to eliminate the kind of interest required for intervention on appeal, and if the court—after hearing only from the petitioner and the agency—were to reverse the agency's order, the once-pre-

vailing, now-aggrieved party would have to start a second round of judicial review. *Id.* at 211–12, 86 S.Ct. at 377–378.

In the present case, for example, if Dixon, *et al.*, were not permitted to intervene in Dankman's petition for review, this would mean that as soon as the Board, after remand, had certified Initiative # 7 for the ballot, Dixon, *et al.*, would have to petition this court as "challengers" alleging a statutory right to seek "review of the reasonableness" of the Board's determination. D.C.Code 1978, Supp., § 1–1108(p)(2) (made applicable by D.C.Code 1980 Supp., § 1–1116(*o*)).[11]

Such two-stage review would be unfair to the initially-prevailing party, who now would have an extra burden of meeting arguments about *stare decisis* if not *res judicata. See Scofield, supra* at 213, 86 S.Ct. at 379. Such an approach, moreover, would waste the time and energy of the

---

shall be filed within thirty days of the date on which the petition for review is filed unless such time is extended by order of the court for good cause shown.

9. *Scofield* is a leading case on the jurisprudence of intervention in administrative proceedings. *See* 3B J. Moore, Federal Practice ¶ 24.06 [3.–1] at 244–111 n.6 (2d ed. 1980). The Supreme Court held that both charged and charging parties who prevail at the N.L.R.B. have a right under § 10(f) of the National Labor Relations Act to intervene in a court of appeals review proceeding.

Judge HARRIS attacks our reliance on *Scofield*, but in support of his standing argument he cites eleven cases, only two of which deal with court review of administrative adjudication. *Ante* at 515–517. *Lee v. Board of Appeals and Review*, D.C.App., 423 A.2d 210, 215 (1980), is inconsistent with Judge HARRIS' own argument that, to determine whether a party is sufficiently injured to have standing for review, the court must look to the Board order alone. *Ante* at 517 n.19. In *Lee*, Judge HARRIS permitted an event external to the Board order (restoration of utilities by a third party) to deprive tenants of standing to seek review of an order granting a variance that permitted their landlord to cut off utilities. As to *Pepsico, Inc. v. F.T.C.*, 472 F.2d 179 (2d Cir. 1972), *cert. denied*, 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973), Judge HARRIS quotes a sentence stating that party status does not assure or preclude judicial review. This is irrelevant here because Dixon, *et al.*, may intervene as of right under D.C.App.R. 15(g).

10. In this case, if Dankman had not petitioned for review, Dixon, *et al.*, obviously would not have standing to do so either. Judge HARRIS cites cases, *ante* at 515–516, for this elementary proposition to support his argument that Dixon, *et al.*, also lack standing once Dankman has petitioned to invalidate the Board's order in Dixon, *et al.*'s favor.

11. D.C.Code 1980 Supp., § 1–1116(*o*) provides in part:

Any qualified elector may, within such ten (10) day period, challenge the validity of any petition, by a written statement duly signed by the challenger and filed with the Board, specifying concisely the alleged defects in such petition. *The provisions of section 1–1108(p)(2) shall be applicable to such challenge....* [Emphasis added.]

D.C.Code 1978 Supp., § 1–1108(p)(2) provides in part:

The Board shall receive evidence in support of and in opposition to the challenge and shall determine the validity of the challenged nominating petition .... Within three days after announcement of the determination of the Board with respect to the validity of the nominating petition, *either the challenger or any person named in the challenged petition as a nominee may apply to the District of Columbia Court of Appeals for a review of the reasonableness of such determination.* The court shall expedite consideration of the matter and the decision of such court shall be final and not appealable. [Emphasis added.]

court, which would have to hear the same case again. *See id.* at 212–13, 86 S.Ct. at 378–379. In summary:

> If the party successful before the Board is not allowed to intervene in the court of appeals and if the court of appeals reverses the Board and returns the case to it for further proceedings, then it is probable that the party who was not allowed to intervene in the first appeal will himself have the right to bring a second appeal. In the interests of judicial efficiency and fairness to the would-be intervenor, the Supreme Court considered it highly desirable to have the court of appeals hear all the parties in one proceeding.

*Hodgson v. United Mine Workers of America,* 51 F.R.D. 270, 272 (D.D.C.1970) (summarizing *Scofield*), *rev'd on other grounds, Trbovich v. United Mine Workers,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). Indeed, the policy favoring intervention by the prevailing party in this jurisdiction is so strong that D.C.App.R. 15(g) permits a "party to the proceeding before the agency" to intervene on appeal as of right, in contrast with the corresponding federal rule that provides only for permissive intervention in the absence of "an applicable statute." Fed.R.App.P. 15(d).

B. I turn now to the scope of intervention: (1) As prevailing party-intervenors, are Dixon, *et al.,* limited to supporting the Board's position, or, in addition, may they advance arguments the Board rejected? (2) If they are permitted to present the additional arguments, does it matter whether they make them as "intervenors" in No. 81–977 or as "petitioners" in No. 81–978?

1. The scope of the right to intervene in administrative proceedings is determined by reference to the statutory scheme governing the particular agency and pro-

ceeding. *See Scofield, supra* 382 U.S. at 210, 86 S.Ct. at 377; *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.,* 331 U.S. 519, 529–31, 67 S.Ct. 1387, 1392–1393, 91 L.Ed. 1646 (1947) (statute grants absolute right to intervene in both administrative and judicial forums); 3B J. Moore, *supra* ¶ 24.06[3.–1]; 9 J. Moore, *supra* ¶ 215.07 (2d ed. 1980).[12] Thus, while it may be true that an intervenor in support of an agency order normally is limited to arguments that track the agency's position before the court, that limitation yields when the governing statute suggests a more comprehensive intervenor's role.

In the present case, the Initiative Procedures Act, D.C.Code 1980 Supp., § 1–1116(*o* ), adopts the appeal rights specified in D.C.Code 1978 Supp., § 1–1108(p)(2). *See* note 11 *supra.* Although this statute does not expressly deal with the scope of the right to intervene, it reflects a policy of equal access to this court by sponsors and challengers of petitions. *Cf. Scofield, supra* (charged and charging parties alike who prevail at N.L.R.B. have right to intervene in court of appeals review proceeding). More specifically, § 1108(p)(2) provides that "either the challenger or any person named in the challenged petition" may apply for review. In addition, the brief statutory timetable for election challenges, coupled with the requirement that this court must "expedite consideration," *id.,* manifests a legislative intention that all election issues be resolved promptly, without piecemeal review. These two aspects of the statute compel a conclusion that both the losing-party petitioner and the prevailing-party intervenors are free on appeal to make every argument raised before, and ruled on, by the Board.[13]

---

12. In *Scofield, supra,* the Supreme Court stated that "in considering the propriety of intervention in the courts of appeals, our discussion is limited to Labor Board review proceedings. Federal agencies are not fungibles for intervention purposes—Congress has treated the matter with attention to the particular statutory scheme and agency." *Id.* 382 U.S. at 210, 86 S.Ct. at 377.

13. *N.L.R.B. v. General Electric Co.,* 358 F.2d 292, 294 (2d Cir.) (per curiam) (upon remand in light of *Scofield, supra,* the Court of Appeals concluded that it could dismiss a union's petition for review of a National Labor Relations Board order because the union "will be permitted *as intervenor* to raise all relevant issues upon review of the other two cases" brought by the Board and General Electric) (emphasis

If the prevailing-party intervenors did not have this equal, unfettered right of review, the very reasons justifying intervention—fairness and judicial economy—would be undermined. In the first place, Dixon, *et al.*, would be penalized for winning one, instead of none, of their arguments to the agency; for if they had lost on all grounds—and thus had become petitioners—the court would have entertained each alleged error. *See* note 11 *supra; cf. Scofield, supra* 382 U.S. at 216, 86 S.Ct. at 380.[14]

Even more telling, however, is the following illustration. Suppose in the present case, that Dixon, *et al.*, could not advance in this court the arguments they lost before the Board, and that we were to reverse on

the basis of Dankman's arguments. As soon as the case was remanded and the Board prepared to certify the initiative for the ballot, Dixon, *et al.* could try to obtain reconsideration by the Board and, if they lost, come to this court once again—this time as petitioners, not intervenors—to challenge the Board ruling on grounds not resolved by the first court review. *See* D.C.Code 1978 Supp., § 1–1108(p)(2); note 11 *supra*. Thus, if Dixon, *et al.*, were not permitted to advance in the first review proceeding all their arguments that the Board rejected, the statutory policy of equal access to this court, on an expedited basis, would be ignored, and the very reasons justifying intervention in the first place would be subverted. *See* Part III.A. *supra.*[15]

---

added), *cert. denied*, 385 U.S. 898, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966).

**14.** In *Scofield, supra* 382 U.S. at 216, 86 S.Ct. at 380, the Supreme Court reasoned:
> When the charged party loses before the Board, he is accorded a statutory right to immediate review and may seek or oppose this Court's ultimate review of the case. If he prevails at the agency level, however, denial of intervention deprives him of the rights accorded a losing party, even though the issue before the reviewing court is identical—whether a remedial order should have been entered against the charged party. These considerations lead us to the assumption that Congress would not intend, without clearly expressing a view to the contrary, that a party should suffer by his own success before the agency.

**15.** According to our en banc order of October 13, 1981, this case was "remanded to the Board with directions to certify, *nunc pro tunc* as of August 3, 1981, Initiative Seven for inclusion on the November 3, 1981, ballot." Ordinarily, in reversing administrative agency rulings, we should merely declare the law and remand for the agency to proceed in light of our decision. *See Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board*, D.C. App., 384 A.2d 412, 420–21 (1978); *Hill v. District Unemployment Compensation Board*, D.C. App., 302 A.2d 226, 230 (1973) (Harris, J., concurring in part and dissenting in part).
Judge HARRIS states:
> Because of the expectation that we would dismiss Dixon, *et al.'s* petition, our October 13, 1981 remand to the Board with directions to certify Initiative Seven for inclusion on the ballot was entirely proper. Intervenor's petition simply could not be entertained for fail-

ure to satisfy the basic "aggrieved" requirement for standing; thus we need not reach the merits of all the additional arguments they raise. The remand did nothing "to cut off judicial review rights guaranteed by statute." *Post* at p. 525 n.15. It merely informed the Board that it had committed an error of law and directed it to correct the error—which was the sole impediment to placing the initiative on the ballot. [*Ante* at 516 n.16.]

This statement is fallacious. In saying that this court could direct the Board to certify Initiative Seven for the ballot because the Board's invalid interpretation of Rule 1607.9 "was the *sole impediment* to placing the initiative on the ballot", *ante* at **516** (emphasis added), Judge HARRIS leaves no room for Dixon, *et al.*, to petition for Board reconsideration of the arguments they lost before the Board, or, thereafter, to seek court review on grounds not resolved by the first court review. As a consequence, he is saying in effect that Dixon, *et al.*, are precluded from judicial review of issues they were never permitted to advance in court, even though, in the end, they are still as aggrieved as they were when they first went before the Board. Accordingly, Judge HARRIS applies a *res judicata* bar against Dixon, *et al.*, to justify this court's directly ordering Initiative Seven onto the ballot, despite the fact that traditionally *res judicata* is applicable only if an issue has been—or could have been—presented. *See Henderson v. Snider Bros., Inc.*, D.C.App., 439 A.2d 48, at 485 (1981) (en banc).

In summary, this court could not properly have ordered Initiative Seven onto the ballot if we had not reached the merits of all the arguments Dixon, *et al.*, cared to make. If we only were going to reach the arguments in No. 81–977, as Judge HARRIS advocates, we simply

Judge HARRIS asserts that this analysis "would afford an intervenor the power effectively to convert agency challenges into renewed litigation between the private parties to the agency proceeding." *Ante* at 517. That is an assertion without meaning. As the statute makes clear, Dixon, *et al.*, are party to the litigation just as much as Dankman or the Board, in contrast with persons of lesser interest who must seek leave of court to intervene under D.C. App.R. 15(g). Furthermore, as Dixon, *et al.*, were prevailing parties before the Board, their very right to intervene on appeal reflects an interest and potential injury sufficient for standing to protect their position in the exceptional context of an election case by using all available legal arguments. They are no less aggrieved before the court than they were before the Board.[16]

Finally, the prevailing party-intervenors are not in a position to expand the litigation beyond its original scope. They are limited to the arguments presented to, and ruled upon by, the Board; they cannot raise a new question for the first time on appeal. *DeLevay v. District of Columbia Rental Accommodations Commission*, D.C.App., 411 A.2d 354, 358 (1980).

In summary, because a petition for review of a Board ruling puts the prevailing party's interests in jeopardy once again, and because D.C.Code 1978 Supp., § 1–1108(p)(2) reflects a legislative intent to provide equal, expedited access to this court for parties affected by the Board's ruling, I conclude that Dixon, *et al.*, as prevailing

party-intervenors, may advance on appeal the arguments the board rejected, as well as accepted.

■ 2. The next question is whether Dixon, *et al.*, have prejudiced their review rights by docketing separately in No. 81–978 the arguments they lost before the Board, rather than presenting all their arguments in No. 81–977 in which they duly intervened. I conclude not, for we have consolidated the two cases and only one Board order is at issue. Although " 'there are two proceedings, separately carried on the docket, they were essentially one so far as any question as to the legality of the Board's order was concerned.' " *Scofield, supra* 382 U.S. at 213 n.6, 86 S.Ct. at 379 n.6 (quoting *Ford Motor Co. v. Labor Board*, 305 U.S. 364, 370, 59 S.Ct. 301, 305, 83 L.Ed. 221 (1939)).

■ Under the *Scofield* rule, as is generally true of administrative proceedings, "the party supporting a Board order, or the party challenged, may intervene, while a party opposing a Board order or a portion of it may petition for review." *N.L.R.B. v. Oil, Chemical and Atomic Workers International Union*, 476 F.2d 1031, 1034 (1st Cir. 1973). Dixon, *et al.*, may have been concerned that this court would characterize their effort for review of contentions the Board rejected as an opposition to a portion of the Board's "order". *See id.* In that case, the court would require that they file a separate petition for review.

As I see it, however, none of Dixon, *et al.*'s arguments in No. 81–978 reflects an effort to oppose the Board "order" or a

---

should have declared the law, reversed, and remanded to the Board, leaving it to Dixon, *et al.*, to petition this court for review pursuant to D.C.Code 1978 Supp., § 1–1108(p)(2) if the Board determined on remand that the initiative was valid. *See* note 11 *supra*. This court cannot properly reverse, remand, *and order Initiative Seven onto the ballot*, thereby precluding—indeed knowingly precluding—Dixon, *et al.*, from review of the issues presented in No. 81–978. In suggesting otherwise, Judge HARRIS in effect would permit this court to cut off judicial review rights guaranteed by statute.

**16.** If Dixon, *et al.*, have a threatened injury sufficient for intervention of right, *see* D.C.

App.R. 15(g), as to issues on which they prevailed before the Board, *see* Part III.A. *supra*, they surely have no less injury to support review of determinations they lost before the Board. Given the threat of a petition for review, they have an equal interest in presenting any argument that may preserve their position. In limiting his analysis of standing to the question of aggrievement by the Board order, *see ante* at 517 n.19, in contrast with aggrievement by Dankman's submission to the Board and petition to the court, Judge HARRIS defines away the fundamental injury—Dankman's threat—that judicial review is all about here.

portion of it.[17] Thus, a separate petition was superfluous; intervention would have sufficed. *See N.L.R.B. v. General Electric Co., supra* at 294. The fact that Dixon, *et al.*, separately docketed the arguments they lost before the Board, however, rather than adding them to No. 81–977, is of no consequence. As long as this court has recognized the unity of the proceeding by consolidating both petitions for review, it would be unfair to say that Dixon, *et al.*'s, precaution in filing a separate petition, instead of relying solely on intervention, could prejudice their review rights.[18]

### IV.

Having concluded that Dixon, *et al.*, may raise arguments rejected by the Board, I nonetheless perceive no Board error on any of the grounds alleged. One of these, however, requires discussion.[19]

Dixon, *et al.*, claim the petitions were notarized improperly. They assert that the 22,624 signatures obtained by the disqualified circulators should be rejected because Jo Ann Willis, Executive Director and Treasurer of the D.C. Committee for Improved Education to Promote Initiative Seven—in notarizing the circulators' signatures—conspired with the circulators to represent to the public that they were bona fide residents of the District. They also allege that Willis violated the following proviso in D.C. Code 1973, § 1–501: "no notary public shall be authorized to take acknowledgments, administer oaths, certify papers, or perform any official acts in connection with matters in which he is employed as counsel, attorney, or agent, or in which he may be in any way interested before any of the departments aforesaid."[20]

**17.** Dixon, *et al.*'s, concern that they may be challenging a portion of an order in No. 81–978 is understandable, for it is not always clear whether, in challenging a rejected contention, a prevailing party is attacking the agency's order or merely is advocating a rejected, alternative basis for an order with which he or she agrees. In *Scofield, supra*, I understand the Supreme Court to mean that one does not challenge an "order" unless the relief he sought is, to some extent, withheld:

A hybrid situation occurs when the Board dismisses certain portions of the complaint and issues an order on others. As to that portion which results in a remedial order against him, the charged party is aggrieved; likewise, the charging party is aggrieved with respect to the portion of the decision dismissing the complaint. Each one is a "party" in a consolidated appeal, and has invariably been granted leave to intervene with regard to the portion of the order on which the Board found in his favor. [*Id.* 382 U.S. at 210, 86 S.Ct. at 377 (footnote omitted).]

**18.** If the court holds that the Board erred in its basis for decision, but the court concludes that the Board also erred in rejecting one or more arguments advanced by Dixon, *et al.*, the court should remand the case rather than affirming the Board's order on one of these other grounds. *See Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (*Chenery II*); *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (*Chenery I*). It is likely, however, that after remand the Board

would reaffirm its order on the ground it previously rejected, since it had misconceived the law as to one of the bases for its ruling, and the decision was premised on legal, not expert, analysis.

**19.** I find no legal merit to the arguments that the summary statement of the initiative bill was misleading, or that the proponents failed to file a timely verified statement of contributors.

**20.** D.C.Code 1973, § 1–501 provides:

The Commissioner of the District of Columbia shall have power to appoint such number of notaries public, residents of said District, or whose sole place of business or employment is located within said District, as, in his discretion, the business of the District may require: *Provided*, That the appointment of any person as such notary public, or the acceptance of his commission as such, or the performance of his duties thereunder, shall not disqualify or prevent such person from representing clients before any of the departments of the United States Government in the District of Columbia or elsewhere: *Provided further*, That such person so appointed as a notary public who appears to practice or represent clients before any such department is not otherwise engaged in Government employ, and shall be admitted by the heads of such departments to practice therein in accordance with the rules and regulations prescribed for other persons or attorneys who are admitted to practice therein:

*And provided further*, That no notary public shall be authorized to take acknowledg-

The Board concluded, however, "that there was no evidence in the record to show a conspiracy between Jo Ann Willis and others to misrepresent the legal status of the circulators to the signatories to the petitions." Board Order at 9. The record supports that conclusion. Furthermore, even if a violation of *id.,* § 1–501 would create a violation of the Initiative Procedures Act by circumventing the circulators' affidavit requirement, I do not agree with Dixon, *et al.,* that the proviso applies to Ms. Willis' actions before the Board.

As I read the statute, the proviso, by its reference to "the departments aforesaid," governs only actions of notaries before departments of the United States Government, not actions before departments of the District of Columbia. *See* note 20 *supra.* Congress indicated that these governments are separate for purposes of § 1–501 by referring separately, in the second paragraph of the statute, to both the United States Government and the District of Columbia Government. Moreover, in the one case analyzing § 1–501, the court clearly understood the proviso to mean that the statute was to protect against conflicts of interest in practice before federal departments. *See Hall's Safe Co. v. Herring-Hall-Marvin Safe Co. (1),* 31 App.D.C. 498 (1908) (holds statute applies to non-District as well as District notaries). The Board, accordingly, did not err in concluding that § 1–501 is inapplicable here.

### V.

Because the Board misapplied its own Rule 1607.9, I concur in reversal of the

ments, administer oaths, certify papers, or perform any official acts in connection with matters in which he is employed as counsel, attorney, or agent, or in which he may be in any way interested before any of the departments aforesaid.

Each notary public before obtaining his commission, and for each renewal thereof, shall pay to the Collector of Taxes of the District of Columbia a license fee of $10: *Provided,* That no license fee shall be collected from any notary public in the service of the United States Government or the District of Columbia Government whose notarial duties are confined solely to Government official business; *And provided further,* That no notary fee shall be collected at any time

Board's order. I perceive no other erroneous interpretation of law that would justify Board reconsideration. Although Rule 1607.9 limits the remedies available for illegal circulation, the criminal process is available to pursue anyone who illegally participated in solicitation of signatures. The political process is available to inform the electorate about the tactics employed by the circulators and their sponsors. And the administrative process is available to those who would propose to change the rule for the future.

MACK, Associate Judge, dissenting:

### I.

The lead opinion (*i.e.,* the opinion authored by Judge Harris) is significant for what it does not say. Conspicuous by its absence is a discussion of the basic finding by the Board of Elections and Ethics that "the evidence before us indicates such a manipulation of the initiative process in direct violation of *statutory direction,* that ... the [challenged] signatures ... must be rejected in order to preserve the integrity of the petition process ... [and ensure] that the *statutory mandate be followed.*" Board of Elections and Ethics Order at 14–15 (emphasis supplied). Conspicuous also by its absence is a discussion of the facts and events surrounding the gathering of the signatures in support of Initiative Seven's placement on the ballot.[1]

Early last year the National Taxpayer's Union, a national organization, formed a

by a notary public who is exempted from the payment of the license fee. The Commissioner is hereby authorized to refund, in the manner prescribed by law for the refunding of erroneously paid taxes, the amount of any fee erroneously paid or collected under this section.

The District of Columbia Council is hereby authorized to prescribe such rules and regulations as it may deem necessary to carry out the purposes of this chapter.

1. I agree with the conclusion of the lead opinion that the challenge to the petitions of Initiative Seven was timely filed so as to vest the Board with jurisdiction.

committee entitled the D.C. Committee for Improved Education to promote Initiative Seven, an initiative similar to the one NTU had previously unsuccessfully promoted in California. This political committee was registered pursuant to a February 17, 1981, filing by Jo Ann Willis, a Virginia resident who, as well as being an employee of NTU, served as Executive Director and Treasurer of the newly-formed committee. She was the only person authorized to disburse money for the committee. Ten days after the filing, Willis personally submitted the Initiative for approval by the D.C. Board of Elections and Ethics.

The committee thereafter hired seven non-District residents to circulate petitions to have Initiative Seven placed on the November ballot. These circulators arrived from such areas as Massachusetts, Florida, Michigan and North Carolina shortly before March 10. The seven were housed in a single family dwelling which, the Board found, was used for transient purposes only. After their arrival, Jo Ann Willis supplied them with mail voter registration forms in order that they could qualify as electors under D.C.Code 1978 Supp., § 1–1102(2). Meanwhile the circulators had collected some 5,879 signatures (i.e., before the forms were executed). At least four of the circulators had previously registered to vote in other jurisdictions and one, six days after his voter registration with the Board, signed a petition to organize a new political party in North Carolina.

These seven circulators collected 22,624 of the 27,415 signatures given on behalf of Initiative Seven [82.52%]. They had left the District June 11. On June 17, 1981, Willis personally picked up the now-departed circulators' voter registration cards at the Board.

On June 29, 1981, Willis submitted 1,711 petitions containing the 22,624 signatures to the Board. On the back of each petition was an oath signed by the circulator of that petition. Among the facts to which each one swore was that he was a "qualified registered elector of the District of Columbia." All of these signatures were notarized by Jo Ann Willis who had become a notary in May 1981 and had noted on her application that she was applying to do so in order to be eligible to sign petitions circulated by the backers of Initiative Seven.[2]

## II.

The foregoing facts amply support the finding of the Board that there was a manipulation of the initiative process so grave as to violate statutory mandate and threaten the integrity of the electoral process. In our review of the administrative process, we are required to affirm an agency's action or finding unless we find it to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; . . . or (E) unsupported by substantial evidence." D.C.Code 1973, § 1–1510. Clearly, we are required to accept the Board's findings here. It is not the province of the courts to substitute their judgment for that of a ministerial officer chosen to determine a certain fact. See Citizens Committee to Recall Rizzo v. Board of Elections, 470 Pa. 1, 367 A.2d 232 (1976).

The evidence of the artful conduct by which the proponents of Initiative Seven obtained some 22,000 signatures here is not disputed. The lead opinion does not question the gravity of that conduct; it does not question the fact that the proponents deliberately and knowingly hired circulators who were not qualified registered electors of the District of Columbia, which they are required to be by statute,[3] or that the actions

---

2. Facts as to the content of Willis' notary application were alleged by the challengers in their brief before the Board and were not refuted by the proponents of the Initiative. They were also alleged by the cross-petitioner before this court and were not refuted.

3. D.C.Code 1980 Supp., § 1–1116(h)(2)(E) provides in pertinent part:

(2) Each petition sheet or sheets for an initiative or referendum measure shall have attached to it, at the time of submission to the Board of Elections and Ethics, a statement made under penalties of perjury, in a form determined by the Board signed by the circu-

of the proponents set the stage for the violation of numerous provisions of the Code requiring legitimacy of information and representations in the registration and petition process.[4] Moreover, it does not question the fact that other jurisdictions, when having found evidence of "wholesale" deception comprising a "pattern so definite and clear" as "to make a mockery of the Election Law," have declared petitions null and void. *In re Lebowitz*, 32 Misc.2d 8, 221 N.Y.S.2d 703, 706 (1961), cited in *Citizens Against Legalized Gambling v. District of Columbia Board of Elections and Ethics*, 501 F.Supp. 786, 790 (D.D.C.), *aff'd* per curiam (No. 80–2251, D.C.Cir., October 28, 1980). Thus, as the Supreme Court of Pennsylvania has noted in *In re Nomination Petition of Cianfrani*, 467 Pa. 491, 359 A.2d 383 (1976), "the provisions of the election laws relating to the form of nominating petitions and the accompanying affidavits are not mere technicalities but are necessary measures to prevent fraud and to preserve the integrity of the election process." *See also Citizens Committee to Recall Rizzo v. Board of Elections, supra* 367 A.2d at 241–42.

The lead opinion, instead, chooses to throw up a barrier of "standing" (about which I will say more later) essentially avoiding the most basic issue before the court (except to suggest that the deception here was not "fatal"). It chooses to focus narrowly on a regulation of the Board (Rule 1008.9) which provides that "the failure of" a circulator to be a registered qualified elector will not invalidate the signature of an otherwise qualified elector. It rejects the Board's explanation that the regulation was promulgated to cover the isolated situations where, due to inadvertence, a few [*i.e., de minimis*] signatures might be obtained by unregistered circulators. *See Citizens Against Legalized Gambling v. District of Columbia Board of Elections and Ethics, supra.* The lead opinion holds that the Board's interpretation is unreasonable and erroneous as a matter of law, and uses that error as a crutch for reversing the Board's decision.

The fallacy of the lead position is that it ignores the statute. The statute *requires* that circulators be qualified electors. The Board could not promulgate a regulation in conflict with the specific requirements of the statute. That is why I find it distressing that the lead opinion can speak so cavalierly of a "validly promulgated and unchallenged regulation ... binding upon the Board." To this extent, I do not see the ruling of the federal district court in the *Gambling* case (as to the validity of the regulation) to be helpful to the lead (or to Judge Ferren's) position. That court, in the

---

lator of that petition which contains the following ...

(E) that the circulator of such initiative or referendum petition sheet is a qualified registered elector of the District of Columbia ....
The term qualified elector is defined by D.C. Code 1977 Supp., § 1–1102(2) as:

[A] citizen of the United States (A) who resides or is domiciled in the District and who does not claim voting residence or right to vote in any State or Territory; (B) who is, or will be on the day of the next election, eighteen years old; and (C) who is not mentally incompetent as adjudged by a court of competent jurisdiction.

Clearly none of the seven circulators were qualified electors as none of them resided in the District. A "residence" must be a "fixed and permanent abode ... for the time being and not a mere temporary locality of existence ... it must be more than a place of mere sojourning or transient visiting." *D'Elia & Marks Co. v. Lyon*, D.C.Mun.App., 31 A.2d 647, 648

(1943). *E.g., District of Columbia v. H.J.B.*, D.C.App., 359 A.2d 285, 291 (1976).

4. D.C.Code 1980 Supp., § 1–1114(b)(3)(D) provides:

Any person who:

(D) makes any false statement to the Board of Elections and Ethics concerning any initiative, referendum or recall petition, or the signatures appended thereto shall be fined not more than $10,000 or be imprisoned not more than one (1) year, or both.

D.C.Code 1977 Supp., § 1–1107(b) provides:

No person shall be registered unless—

(1) he or she is a qualified elector; ....

D.C.Code 1980 Supp., § 1–1114(a) provides:

Any person who shall register, ... under the provisions of this chapter and make any false representations as to his or her qualifications for voting or for holding elective office, ... shall upon conviction thereof be fined not more than $10,000 or be imprisoned not more than five years, or both.

circumstances of that case, did not find the "wholesale" deception on the part of the circulators which, concededly, has been found to "[raise] doubts as to the validity of the signatures themselves." 501 F.Supp. at 790. Thus, in this situation [where the infractions were "de minimis" and where there was no suggestion of fraudulent behavior] the court found that "noncompliance by the circulator need not—*as a matter of law*—invalidate the signature so long as criminal sanctions are pursued." *Id.* at 790–91 (emphasis added). This reasoning tracks the reasoning of the Board's interpretation of its regulation. Indeed it is the only reasonable construction (if any) which could save the validity of its regulation.[5] The conclusions that the Board has played "fast and loose" (Judge Harris) or "[un]faithfully" (Judge Ferren) with the regulation are not supported and are moreover irrelevant. The action of the Board, no matter how "whimsical," cannot be used to subvert the electoral process. Moreover, the proponents of Initiative Seven could not in good faith have relied upon the regulation since they chose the devious route of misrepresenting the status of the circulators in a pattern of conduct which, in my view, this court cannot afford to ignore. As the Supreme Court of Pennsylvania has noted (in *Cianfrani, supra,* 359 A.2d at 384), "the policy of the liberal reading of the Election Code cannot be distorted to emas-

culate those requirements necessary to assure the probity of the process." It would be foolhardy for us to do so.

## III.

The lead opinion attempts to avoid the basic issues raised in this court by holding that the challengers (intervenors below) and cross-petitioners here, have no standing to raise any issues because they prevailed below. Leaving aside for the moment the fact that the proponents of the initiative have argued in this court that the circulators were residents of the District of Columbia, the fact that the cases of petitioners and cross-petitioners were consolidated by order of this court "for all purposes," and the fact that each petitioner has intervened as a party respondent in the case brought here by the other, the reasoning of the lead opinion that the challengers have not been "aggrieved" by the Board's order is difficult to grasp. Of course, the electorate is aggrieved if the Board has improperly rejected contentions that the notarizations of the petitions were improperly executed, or that a summary statement of the initiative or statements made by circulators were misleading. Of course, the electorate is aggrieved if this court reverses the Board for violating its own regulation—and in so doing gives its imprimatur to the very conduct challenged and found to be violative of statutory mandate.[6] *Cf. Lee v. District of Co-*

---

5. It is a cardinal principle of legal interpretation that laws are to be construed as to preserve validity. *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.,* 305 U.S. 315, 332–33, 59 S.Ct. 191, 199–200, 83 L.Ed. 195 (1938), *rehearing denied,* 305 U.S. 675, 59 S.Ct. 356, 83 L.Ed. 437 (1939). I do not see the Board's interpretation to be so unreasonable as to warrant our departure from the rule of affording deference to an agency's interpretation. *See Pendleton v. Board of Elections & Ethics,* D.C. App., 433 A.2d 1102 (1981); *Snider v. District of Columbia Board of Appeals and Review,* D.C.App., 342 A.2d 50, 51 (1975); *In re Haworth,* D.C.App., 258 A.2d 447 (1969); *Sellers v. District of Columbia,* D.C.Mun.App., 143 A.2d 96, 98 (1958); *Wright v. Paine,* 110 U.S. App.D.C. 100, 102, 289 F.2d 766, 768 (1961); D.C.Code 1978 Supp., § 1–1108(p)(2).

6. The three-pronged standing test was enunciated in *Association of Data Processing Service*

*Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In order to seek review of an agency decision:

> 1) a petitioner must allege injury in fact;
> 2) the petitioner must be arguably within the zone of interests to be protected; or regulated by the statute in question; and
> 3) there must be no clear legislative intent to withhold judicial review . . . .

The second and third prongs are clearly fulfilled here. The petitioners, as qualified electors, are within the zone of interests to be protected by voting rules and regulations enacted, to insure the greatest degree of integrity in the signature solicitation process. *See* Committee Report, D.C. Council Committee on Government Operations, January 31, 1979. As to the third, D.C.Code 1978 Supp. § 1–1510 provides for appeals to this court of "an order or decision of . . . an agency in a contested case . . . ."

*lumbia Board of Appeals & Review*, D.C. App., 423 A.2d 210, 218 (1980) (Ferren, J., dissenting).[7]

Moreover, it is as illogical to say that the challengers are estopped from appealing on any bases because the Board found for them below as it would be to deny a "successful" personal injury plaintiff the right to appeal an insufficient award of damages simply because he had "won" below. A successful plaintiff should not, when replying to the appeal of his opponent below, be denied standing to appeal rulings adverse to him, especially when, should his opponent prevail on appeal, he would be left without legal recourse.[8] *Cf. Telephone Users Association v. Public Service Commission*, D.C. App., 304 A.2d 293 (1973), *cert. denied*, 415 U.S. 933–34, 94 S.Ct. 1448, 1449, 39 L.Ed.2d 492 (1974) (C & P Telephone Company had standing to appeal what it asserted was an insufficient rate increase).[9]

### IV.

The lead opinion also rules that, even if standing is granted, this court cannot affirm the Board's action by substituting what it considers to be a more adequate basis for that action. *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (*Chenery II*); *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (*Chenery I*). However, as the Court realized in *Chenery I* and as this court has recognized in recent cases, "if [an agency's] action is based upon a determination of law ... an order may not stand if the agency has misconceived the law." *Chenery I, supra* at 94, 63 S.Ct. at 462; *Thomas v. District of Columbia Department of Labor*, D.C.App., 409 A.2d 164, 169 (1979); *Gordon v. District of Columbia Unemployment Compensation Board*, D.C. App., 402 A.2d 1251, 1254 (1979). *See Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

In this regard I would note that, even if we needed a "more adequate basis" on which to sustain the Board's order (which we do not), the petitioners do have standing to challenge the Board's interpretation of D.C.Code 1973, § 1–501 and its bearing on Willis' notarization of the challenged petitions.[10] It rested solely on a legal determination and, therefore, we may not only reverse the Board's holding on that issue but may also affirm the Board's order on that basis. This is especially true in light of the fact that § 1–501 is not a Board Rule but a general notary provision. As such, we owe less deference to the Board's interpretation of it than we would to a Board interpretation of its own rules and procedures. *See Capitol Hill Restoration Society v. Zoning Commission of the District of*

---

7. In this regard I would agree with the dissent in *Lee v. District of Columbia Board of Appeals & Review, supra*. The case involved a Board ruling that landlords were not obligated to provide essential services to their tenants. The majority of this court (the same judges who comprised the original division majority here) denied the petitioners' standing to appeal the Board's decision because the District had, after the decision, elected to, in its discretion, provide those services itself. The court reasoned that the petitioners had suffered no "injury in fact," the same barrier advanced here. This left the petitioners without any recourse against the only party which could be legally bound to provide the services. *Id.* at 219 (Ferren, J., dissenting).

8. While I disagree with Judge Ferren's view of the merits of Dixon, *et al.*'s, claims in Part IV of his concurring opinion, I agree with his analysis of the standing issue as set forth in Part III of that opinion.

9. Neither of the other decisions of this court regarding standing to appeal a ruling of a District administrative agency or board are apposite here. This is not a case like *Basiliko v. Government of the District of Columbia*, D.C. App., 283 A.2d 816 (1971), where a nonparty to the action below sought to stay an order of the Board of Condemnation, nor is it analogous to *Telephone Users Association, supra*, where an entity which did not subscribe to phone service sought to appeal a rate increase.

10. Two other Board determinations, those regarding the misleading nature of the summary statement and statements made by the circulators were factually based and, as such, we must give due deference to them.

*Columbia,* D.C.App., 380 A.2d 174 (1977), *overruled on other grounds, Citizens Association of Georgetown v. Zoning Commission of the District of Columbia,* D.C.App., 392 A.2d 1027, 1036 (1978).

Board Rule 1003.4(e) requires a circulator to sign, under penalties of perjury, a statement that he is a qualified elector of the District. To that end, Jo Ann Willis, a Notary as of May 1981, notarized and submitted each of the 1,711 petitions to the Board. The pertinent language of D.C. Code 1973, § 1–501 reads, as follows:

> The Commissioner of the District of Columbia shall have power to appoint such number of notaries public, residents of said District, or whose sole place of business or employment is located within said District, as, in his discretion, the business of the District may require: *Provided,* That the appointment of any person as such notary public, or the acceptance of his commission as such, or the performance of the duties thereunder, shall not disqualify or prevent such person from representing clients before any of the departments of the United States Government in the District of Columbia or elsewhere.... *And provided further, that no notary public shall be authorized to take acknowledgments, administer oaths, certify papers, or perform any official acts in connection with matters in which he is employed as counsel, attorney, or agent, or in which he may be in any way interested before any of the departments aforesaid.* [Emphasis added.]

The last proviso of § 1–501 was not included in the original bill. There was strong opposition to the bill, however, as many feared that permitting notaries to act in matters where they might also be engaged as attorneys would "open the doors to fraud and deceit." *Hall's Safe Co. v. Herring-Hall-Marvin Safe Co (I),* 31 App. D.C. 498, 503 (1908). Thus, the last proviso was added.

Clearly, the actions of Ms. Willis rendered her an agent and/or an interested party for purposes of § 1–501. She not only hired, housed, registered and organized the circulators, but after they returned the petitions to Willis they swore to her as to their qualified elector status. Thus, she was directly involved in creating the facts about which the circulators thereafter swore to her.

The Board rejected the petitioner's § 1–501 contention ruling, as a matter of law, that the Board was not a department of the United States government for purposes of § 1–501. This conclusion was contrary to the history and purposes surrounding the adoption of § 1–501 and, therefore, I would reverse the Board's ruling.

D.C.Code 1973, § 1–501 was passed by the Congress in 1906 and has not changed in any material way since. At the time of its passage the District was governed in accordance with the Organic Act of 1878, 20 Stat. 102. Under the Act, the District was governed by a three-member board, two of whom were appointed by the President, with the consent of the Senate, and the third of whom was an active officer of the Army Corps of Engineers. Congress had sole and complete authority to legislate on District matters, and "the municipal government [was] confined to mere administration." *Metropolitan Railroad v. District of Columbia,* 132 U.S. 1, 7, 10 S.Ct. 19, 21, 33 L.Ed. 231 (1889). There was no provision made for the franchise; all taxes collected by the District were deposited in the United States Treasury and all claims against the District were to be submitted to the Treasurer of the United States for payment. In effect, then, the District, in 1906, was a federal department.

With the advent of Home Rule (District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), codified at D.C. Code 1978 Supp., §§ 1–121 to –171), Congress could not have intended to exclude the District of Columbia from the provisions of § 1–501. In granting the limited right of self-government, it clearly delineated the areas of federal control which would remain extant. It could not have intended to abrogate a provision which insures that

the integrity of public processes, electoral or otherwise, shall not be tainted by a less than disinterested notary abusing the public trust. Therefore § 1–501 is applicable; the notarizations were illegal and the petitions void. *See Citizens Committee to Recall Rizzo, supra* at 242–43.

I would affirm the ruling of the Board rejecting the signatures and would reverse the Board's ruling that D.C.Code 1973, § 1–501 is inapplicable to this case.